Argued February 4, reversed and remanded December 19, 1969

STATE OF OREGON, *Respondent, v.*
TIMOTHY EARL GANN,
*Appellant.*
463 P. 2d 570

*Gary D. Babcock,* Public Defender, Salem, argued the cause and filed a brief for appellant.

*Gary D. Gortmaker,* District Attorney, Salem, argued the cause and filed a brief for respondent.

DENECKE, J.

The defendant was convicted of holding a person as a hostage within the Oregon State Penitentiary. Subsequently, an information of previous convictions was filed and the defendant was sentenced to life imprisonment. He appeals.

I

■ The defendant contends that he was convicted in violation of the sixth and fourteenth amendments to the Federal Constitution because he was convicted by a verdict of ten of twelve jurors.[1]

In 1934 the people of Oregon amended the Oregon Constitution as follows: "*  *  * [P]rovided, however, that in the circuit court ten members of the jury may render a verdict of guilty or not guilty, save and except a verdict of guilty of first degree murder, which shall be found only by a unanimous verdict, and not otherwise; *  *  *." Oregon Constitution, Art I, § 11.

Prior to the amendment of the Oregon Constitution the United States Supreme Court held that the Sixth Amendment required that in federal trials the jury consist of twelve men and stated that the jury verdict in such cases must be unanimous. *Thompson v. State of Utah,* 170 US 343, 351, 353, 18 S Ct 620, 42 L Ed 1061 (1898). A similar view was also expressed in *Maxwell v. Dow,* 176 US 581, 586, 20 S Ct 448, 494,

---

[1] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed *  *  *." U. S. Const., Amend. VI.

"*  *  * No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U. S. Const., Amend. XIV, § 1.

44 L Ed 597 (1900). However, in the latter case it was held that the Constitution of the United States, including the Due Process Clause of the Fourteenth Amendment, did not require the states to try criminal cases with a jury and did not prohibit a state from providing that a jury in noncapital criminal trials would consist of eight jurors instead of twelve. Hence, the Oregon constitutional provision was not thought to present any problem either at the time of its adoption or for many years thereafter.

The decisions of *Duncan v. Louisiana,* 391 US 145, 88 S Ct 1444, 20 L Ed2d 491, rehr den 392 US 947, 88 S Ct 2270, 20 L Ed2d 1412 (1968), and *Bloom v. Illinois,* 391 US 194, 213, 88 S Ct 1477, 20 L Ed2d 522 (1968), have recently caused uncertainty as to the validity of Art I, § 11, of the Oregon Constitution. Those cases overruled *Maxwell v. Dow,* supra (176 US 581), and its successors and decided that the right to a trial by jury in a criminal case, as guaranteed in federal trials by the sixth amendment to the Federal Constitution, is guaranteed in state trials by the Due Process Clause of the Fourteenth Amendment.

In the case at bar, the defendant and the dissent argue that defendants in state criminal trials can be convicted only by a unanimous twelve-man jury verdict because the Sixth Amendment has been held to require a unanimous verdict by a jury of twelve men in federal criminal trials, and the Sixth Amendment right to a jury trial is now applicable to the states by way of the Fourteenth Amendment.

It should be noted, however, that it has not been held that all the aspects of the right to a jury trial in federal criminal cases apply identically to state criminal trials. Mr. Justice White, writing for the majority in *Duncan v. Louisiana,* supra (391 US 145),

observed at 158, note 30, that Louisiana asserted that if trial by jury is made mandatory on the states, all the incidents of trial by jury which have previously been held to be guaranteed by the Sixth Amendment in federal trials will also be mandatory. Mr. Justice White did not answer this contention, but rather stated that the *Duncan* decision would not require widespread changes in the laws of the states. He gave as a reason for this statement: "First, our decisions interpreting the Sixth Amendment are always subject to reconsideration * * *." 391 US at 158. Also, Mr. Justice Fortas specially concurring in the majority decision stated:

> "But although I agree with the decision of the Court, I cannot agree with the implication, see *ante,* at 158-159, n. 30, that the tail must go with the hide: that when we hold, influenced by the Sixth Amendment, that 'due process' requires that the States accord the right of jury trial for all but petty offenses, we automatically import all of the ancillary rules which have been or may hereafter be developed incidental to the right to jury trial in the federal courts. I see no reason whatever, for example, to assume that our decision today should require us to impose federal requirements such as unanimous verdicts or a jury of 12 upon the States. We may well conclude that these and other features of federal jury practice are by no means fundamental—that they are not essential to due process of law—and that they are not obligatory on the States." See *Duncan v. Louisiana,* supra (391 US at 162). *Bloom v. Illinois,* supra (391 US at 213).

In our opinion, the case of *De Stefano v. Woods* (*Carcerano v. Gladden*), 392 US 631, 88 S Ct 2093, 20 L Ed2d 1308 (1968), decided after *Duncan v. Louisiana,* supra (391 US 145), and concerning a ten-

to-two Oregon verdict does not offer any indication of how the Court will decide the question of unanimity. The Court held that *Duncan v. Louisiana,* supra (391 US 145), did not apply because the trials were held before that decision. During the current term the Court has again used the same approach. In *De Backer v. Brainard,* 396 US 28, 90 S Ct 163, 24 L Ed2d 148, decided November 12, 1969, the appellant asked the Court to rule that a jury trial was constitutionally required in state juvenile proceedings. The Court instead held that *Duncan v. Louisiana,* supra (391 US 145), would not be applied to juvenile proceedings held before the decision in *Duncan v. Louisiana,* citing *De Stefano v. Woods.* We cannot find in either decision any indication of how the Court would decide the question which the Court avoided answering.

The contention that the Fourteenth Amendment requires a unanimous verdict of twelve jurors is unacceptable for two principal reasons: (1) its cornerstone, the decision that the Sixth Amendment requires a twelve-man unanimous verdict, was reached by a sterile historical approach to the Bill of Rights which is now—and in our opinion very correctly—usually ignored by the United States Supreme Court; and (2) the "right" in issue, a unanimous verdict rather than a verdict by ten of the twelve jurors, is not of sufficient consequence to be fitted with constitutional rigidity.

In *Thompson v. Utah,* supra (170 US 343), the defendant was convicted of a felony by a twelve-man jury in the Utah territorial court. The defendant obtained a new trial. Utah became a state and the second trial was in a Utah state court. As provided by Utah law, an eight-man jury tried and convicted the defendant. A majority of the Court held that because

the crime had been committed in the territory of Utah, federal law applied and the Sixth Amendment required a trial by a twelve-man jury and by dictum stated that unanimity was required of the twelve jurors.

Mr. Justice Harlan, writing for the majority, cited the Magna Charta, Hale, The History of the Pleas of the Crown, Bacon's Abridgment, all to the effect that the common law required a twelve-man unanimous jury and, therefore, the Sixth Amendment so required.

Mr. Justice Harlan was relying upon the same principle of constitutional construction that he stated in his dissent in *Hurtado v. People of California,* 110 US 516, 542, 4 S Ct 111, 28 L Ed 232 (1884). He there quoted from *Murray v. Land & I Co.,* 59 US 272, 276-277 (18 How 1855):

> " '* * * To what principles are we to resort to ascertain whether this process enacted by Congress is due process? To this the answer must be two-fold. We must examine the Constitution itself to see whether this process be in conflict with any of its provisions. If not found to be so, we must look *to those settled usages and modes of procceding existing in the common and statute law of England before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country.*' " 110 US at 542.

For amplification of Mr. Justice Harlan's views on due process see Johns Hopkins University Studies in Historical and Political Science, 59-82 (1915).

Mr. Justice White in *Duncan v. Louisiana,* supra (391 US at 151, n 16), pointed out that Mr. Justice

Harlan was historically inaccurate in stating that the Magna Charta was the origin of the guarantee of a right of trial by jury. Historians now are in general agreement that the right of trial by jury was not one of the rights wrung from King John in Magna Charta. Clark, *Magna Carta and Trial by Jury*, 58 Am L Rev 24 (1924).

Nevertheless, Mr. Justice Harlan was probably correct that a twelve-man unanimous verdict was the practice in England as well as the colonies in the latter 18th Century. Historians now, however, generally believe that both the requirements of twelve jurors and of unanimity evolved by accident.

Sir Patrick Devlin writes:

> "This leads naturally to a consideration of the unanimity rule. The rule makes a startling exception to the ordinary processes of English administrative life where decisions, even the most momentous, are most invariably produced from a majority vote. Why is the verdict of a jury thought to require a degree of assent which for most purposes would be rejected as impracticable? The answer is that no one ever planned that it should be that way; the rule is simply an antique. Twelve witnesses were required to support the winning party and naturally for that purpose their testimony had to be unanimous; when the twelve witnesses were translated into judges, the unanimity rule, notwithstanding that its original significance had then departed, remained with them. * * *" Devlin, Trial by Jury 48 (1956).

Accord, Proffatt, Jury Trial, 114-115 (1877), and Lesser, History of the Jury System, 188, note 30 (1894), but for a somewhat different version, see 197, note 42. Proffatt has still another theory of origin, which also has no relationship to the modern rule of unanimity.

An accident of English history is not a firm foundation for a cornerstone of American constitutional law; nevertheless, a majority of the United States Supreme Court continued to search English legal history to determine the scope of the American constitutional guarantee of trial by jury. The ultimate may have been reached in *Dimick v. Schiedt,* 293 US 474, 55 S Ct 296, 79 L Ed 603, 95 ALR 1150 (1935). The majority held that a federal district court violated the Seventh Amendment guaranteeing a jury trial in civil cases because the trial court set aside a verdict in an automobile damage case on the ground that the damages awarded were insufficient. Mr. Justice Stone, joined by Mr. Chief Justice Hughes and Messrs. Associate Justices Brandeis and Cardozo, dissented and by his statement of the question revealed the sterility of the majority's reasoning:

"* * * The question is a narrow one: whether there is anything in the Seventh Amendment or in the rules of the common law, as it had developed before the adoption of the Amendment, which would require a federal appellate court to set aside the denial of the motion merely because the particular reasons which moved the trial judge to deny it are not shown to have similarly moved any English judge before 1791.

"The Seventh Amendment commands that 'in suits at common law,' the right to trial by jury shall be preserved, and that 'no fact tried by a jury shall be otherwise re-examined by any court of the United States, than according to the rules of the common law.' Such a provision of a great instrument of government, intended to endure for unnumbered generations, is concerned with substance and not with form. There is nothing in its history or language to suggest that the Amendment had any purpose but to preserve the essentials of the jury trial as it was known to the common law

before the adoption of the Constitution. For that reason the Court has often refused to construe it as intended to perpetuate in changeless form the *minutiae* of trial practice as it existed in the English courts in 1791. From the beginning, its language has been regarded as but subservient to the single purpose of the Amendment, to preserve the essentials of the jury trial in actions at law, serving to distinguish them from suits in equity and admiralty, see *Parsons v. Bedford,* 3 Pet. 433, 446, and to safeguard the jury's function from any encroachment which the common law did not permit." 293 US at 490-491.

2. In an earlier decision, a majority of the Court, Mr. Justice Harlan dissenting, expressed the same repugnance of the sterile historical method of construction:

"* * * But to hold that such a characteristic [it must be part of the English common law and suited to the American colonies] is essential to due process of law, would be to deny every quality of the law but its age, and to render it incapable of progress or improvement. It would be to stamp upon our jurisprudence the unchangeableness attributed to the laws of the Medes and Persians." *Hurtado v. People of California,* supra (110 US at 528-529).②

---

② Our recent decision in Cornelison v. Seabold, 254 Or 401, 460 P2d 1009 (1969), construing the Oregon constitutional protection of civil jury trials, might be construed as following this same sterile approach. We believe there is a distinction. The Oregon Constitution was not intended to guarantee jury trials in all civil proceedings; therefore, it is appropriate to inquire into historical practice to find a basis for distinguishing between civil cases requiring a jury and others not requiring one. In addition, "* * * the constitutional right of trial by jury· is not to be narrowly construed, and is not limited strictly to those cases in which it had existed before the adoption of the Constitution, but is to be extended to cases of like nature as they may hereafter arise." State

The United States Supreme Court has on occasion continued to bolster the grounds for their decisions by citing English legal history. *Fay v. Noia*, 372 US 391, 83 S Ct 822, 9 L Ed2d 837 (1963). They have not, however, in recent years, decided constitutional rights on the basis of English and colonial practices in 1791. When legal history may not support the Court's view of what the constitution should mean today it has made no reference to history. The change in the application of the right against self-incrimination as contained in the Fifth and Fourteenth Amendments is an example of the latter.

In 1908 when *Twining v. New Jersey*, 211 US 78, 29 S Ct 14, 53 L Ed 97, was decided the court apparently wholeheartedly subscribed to the historic approach—a fundamental question being, what was the common law of England in 1791 and what parts of it were well accepted in the colonies just prior to the American Revolution? The majority disagreed with Mr. Justice Harlan upon the answer to that historical question. The majority concluded that the privilege against self-incrimination was not a part of due process of law as practiced in England and the colonies, but rather, was merely a principle of the law of evidence. The majority held, therefore, that neither the Fourteenth Amendment by itself nor the Fourteenth Amendment incorporating the Fifth Amendment re-

---

v. 1920 Studebaker Touring Car, 120 Or 254, 263, 251 P 701, 50 ALR 81 (1927). Hence, the attention to history in *Cornelison,* supra, was in accordance with the general task of the Oregon Supreme Court to determine which civil proceedings among those not set forth in the Constitution require jury trials. The court has an entirely different function in determining the scope of the trial by jury in criminal proceedings guaranteed by the United States Constitution.

quired the states to observe the right against self-incrimination.

*Malloy v. Hogan,* 378 US 1, 84 S Ct 1489, 12 L Ed2d 653 (1964), overruled *Twining v. New Jersey,* supra (211 US 78); however, neither the majority opinion nor the dissenting opinions mention the practice in England or the colonies. The Court held that a right is protected by the Due Process Clause if it is " 'a fundamental right, essential to a fair trial.' " *Malloy v. Hogan,* supra (378 US at 6), quoting *Gideon v. Wainwright,* 372 US 335, 343-344, 83 S Ct 792, 9 L Ed2d 799, 804-805, 93 ALR2d 733 (1963). Whether such a right existed in England and had been adopted by the colonies by 1791 can, at least at present, be considered only important to historians.

If the historical approach is to prevail and a decision rendered by a judge on the assizes in the reign of Edward III determines the fundamental rights of Americans in 1969, other English and colonial practices, some less acceptable than a unanimous verdict of twelve, may rear up through the cobwebs and dust and claim similar recognition.[9]

In England, in the colonies, and in many of the states, a jury was required to be composed only of white male property owners. Devlin, supra, at 17; Lesser, supra, at 181-183; General Laws of Oregon 1843-1872, § 918, p 290. The United States Supreme Court undoubtedly would not hold that the Fourteenth Amendment requires the exclusion from juries of all persons other than white male property owners. However, based upon pure logic, if a unanimous verdict of twelve is required merely because that was the Eng-

---

[9] Proffatt states that a decision in the time of Edward III held that a verdict of less than twelve was a nullity. Proffatt, Jury Trial, 113 (1877).

lish practice adopted in the American colonies, it would seem to follow that jurors are, for the same reason, required to consist solely of property owners who are white and male.

The dissent concludes that in addition to being historically required, the right to be convicted only by a unanimous jury is a fundamental right.

The most plausible argument in support of the unanimity requirement is to the effect that, since one can be convicted only upon being found guilty beyond a reasonable doubt, a nonunanimous jury verdict cannot result in conviction because the disagreement with a guilty verdict by one or two of the twelve jurors is sufficient to establish that there is reasonable doubt as to the guilt of the defendant. Proffatt held this view. Proffatt, supra, at 117.

We respectfully decline to adopt this view. In our opinion a failure of one or two jurors to agree with the verdict of their fellow jurors is more likely to be caused by a failure of the dissenters to correctly understand the evidence or the court's instructions or by some extraneous cause having no relation to the quantum of proof. Proof beyond a reasonable doubt is not like a physical or chemical property the presence of which can be objectively ascertained. Unless the absence of proof is so conspicuous that a judge can hold "as a matter of law" that proof beyond a reasonable doubt has not been established, there is no test to determine whether such a degree of proof has been adduced. It does not appear that the nonconcurrence of one or two jurors signals such a defect.

■ We interpret the decisions of the United States Supreme Court to hold that due process requires the use of those procedures which are so fundamental that

their absence impairs or discredits the fact-finding process. *Gideon v. Wainwright,* supra (372 US 335), is an example. We conclude that the absence of the unanimity requirement does not impair or discredit the fact-finding process.

The United States Supreme Court has specifically held that the right to be convicted only by a unanimous jury verdict is not "a fundamental right." The Republic of Hawaii had a system of criminal procedure which provided that indictment be by a judge, not a grand jury, and that nine of twelve jurors could return a verdict. When Hawaii ceded to the United States, the question of whether such provisions were contrary to the United States Constitution was presented. The Court held they were not unconstitutional:

> "\* \* \* We would even go farther, and say that most, if not all, the privileges and immunities contained in the bill of rights of the Constitution were intended to apply from the moment of annexation; but we place our decision of this case upon the ground that the two rights alleged to be violated in this case are not fundamental in their nature, but concern merely a method of procedure which sixty years of practice had shown to be suited to the conditions of the island, and well calculated to conserve the rights of their citizens to their lives, their property and their well-being." *Hawaii v. Mankichi,* 190 US 197, 217-218, 23 S Ct 787, 47 L Ed 1016 (1903).

Thirty-five years of practice have shown the Oregon procedure to be suited to Oregon conditions. The evidence, so far as we have been able to observe, is that the Oregon system has been as just as the system in jurisdictions requiring a unanimous verdict. Observers favoring unanimous verdicts concede that the lack of a unanimous requirement has not broken down

justice in Oregon. Kalven and Zeisel, *The American Jury*, 48 Chi Bar Record 195, 201 (1967).

If unanimity were a "fundamental principle" of due process, "essential to a fair trial," one would expect harmony of opinion concerning the desirability of unanimity as a procedure, if not as a constitutional requirement. There is no such concord.

Unanimity has been attacked in the land of its birth, England, for over 100 years. The English constitutional historian Hallam stated the most repeated denunciation. He termed unanimity, "that preposterous relic of barbarism." Hallam, The Middle Ages (Supp), notes p 262, quoted with approval in Lesser, supra, at 187.

The Commission on the Courts of Common Law, appointed in 1830 as a result of the law reform movement of Bentham and others, reported: " 'The interests of justice seem manifestly to require a change of law upon this subject [unanimity],' " quoted in Lesser, supra, at 187, note 28.[⊕] Reform took a little time; however, the requirement of unanimity was finally abolished by the Criminal Justice Act 1967, § 13.

Since the English are not supposed to treasure trial by jury as do we Americans, the recent abolition of the unanimity requirement by the English Parliament may not have significance for this country. However, criticism of unanimity as a desirable policy has been as great in the United States. Oregon's first legal scholar, Judge Mathew Deady, wrote:

> "But by far the greater portion of the unsatisfactory results of trial by jury is directly due to the perversion and abuse of the institution, brought about by improper legislation and practices con-

---

[⊕] It is not completely certain they were referring to criminal trials.

cerning the selection and formation of juries, and the conduct of a trial with them. The most serious of these are:—

"1. The rule requiring unanimity in the verdict of a jury;

"\* \* \* \* \*

"The rule requiring a verdict to be the unanimous opinion of the jury ought to be changed, so that a majority may give a verdict." Deady, *Trial by Jury*, 17 Am L Rev 398, 400-401 (1883).

More recent and less provincial is the official draft of the American Law Institute's Code of Criminal Procedure, § 355, published in 1931:

"In capital cases no verdict may be rendered unless all the jurors concur in it. In other cases of felony a verdict concurred in by five-sixths of the jurors, and in cases of misdemeanor a verdict concurred in by two-third of the jurors may be rendered."[9]

■ In addition to all the considerations before mentioned, we must remember that we are passing upon a provision of the Constitution of the State of Oregon. We consistently hold that we will "declare no act of the legislature void unless invalidity be shown beyond a reasonable doubt." *State v. Anthony*, 179 Or 282, 301, 169 P2d 587, cert den 330 US 826, 67 S Ct 865, 91 L Ed 1276 (1946); *State v. Collis*, 243 Or 222, 231, 413 P2d 53 (1966). Certainly, at least as much of a presumption of validity should be given to the State Constitution.

---

[9] Apparently, few states adopted the Institute's recommendation. Oregon, sometimes in the vanguard of legal reform, is an exception. Mr. Justice White states that only Oregon and Louisiana now permit less than unanimous verdicts. Duncan v. Louisiana, 391 US 145, 158, n 30, 88 S Ct 1444, 20 L Ed2d 491, rehr den 392 US 947, 88 S Ct 2270, 20 L Ed2d 1412 (1968).

Because of the absence of any decision of the United States Supreme Court directly to the contrary, because the people of Oregon were acting within their power to regulate the incidents of criminal procedure when they adopted Art I, § 11, and because a unanimous verdict is not a "fundamental right, essential to a fair trial," we hold that the Oregon Constitution is not in violation of the Fourteenth Amendment.

## II

Five days before the trial was to commence the defendant filed a motion requesting the court to order the state to produce four former inmates of the prison who had been transferred out of the state into the custody of the federal prison system. The defendant stated in an affidavit filed in support of the motion that the four individuals "can testify that I did not wilfully and feloniously hold any hostage." The defendant stated that he had not talked to any of the four since their transfer; however, he knew them well and believed they would testify that he was not holding the guard as a hostage. The motion was argued the morning the case was set for trial and the trial court denied the motion, stating:

"Well, I am not unmindful of the fact that it has been testified to before me that there was up to a thousand men in the yard of the Penitentiary on the date the alleged incident occurred, and out of that many available witnesses, I wonder at the good faith of the defendant in requesting these four inmates. Because he has subpoenaed five others, and at some point the calling of additional witnesses would only be cumulative. I will sustain the objection on that basis and deny the motion."

Defense counsel informed the court that he would rather have the four out-of-state witnesses called than

the five inmates referred to by the court and he would waive calling the five if he could have the presence of the four. The request for the five in-state inmates was made the day the case was set for trial. He pointed out that the four had been transferred out of the state before he had been appointed counsel. On the timeliness of the motion counsel stated "that under the circumstances of visitation at the penitentiary it could not have been done any faster."

The trial court's denial of this motion is assigned as error.

■ The trial court and defense counsel were both of the opinion that an order by the court to the Oregon State Corrections Department would effectively bring the four potential witnesses before the trial court. We agree that ORS 421.215 provides for the production of witnesses detained in federal prisons by agreement with Oregon. Because the four were in federal facilities pursuant to an agreement with the State of Oregon, the Oregon Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal proceedings, ORS 139.210–139.260, is not directly applicable; however, the act's policy that the sought-after witness must be "material" is applicable.

We conclude that the defendant made an adequate showing that the four were "material" and that he acted in good faith in requesting that they be brought before the court to testify. In addition to the above-stated evidence adduced by the defendant, the district attorney stated that the four were also indicted for holding guards as hostages. From these facts we can reasonably infer that these four had more knowledge of defendant's conduct than most of the other inmates.

■ We are loathe to reverse a trial court on a ruling which concerns the conduct of the trial, which

conduct is traditionally, and rightly so, left largely to the discretion of the trial court.⊕ We act, however, because we conclude that the denial of defendant's request is an infringement of the defendant's constitutional right to the compulsory process of favorable witnesses. Oregon Constitution, Art I, § 11.⊘

In *State ex rel Gladden v. Lonergan,* 201 Or 163, 269 P2d 491 (1954), this court refused to issue a writ of mandamus to two circuit judges to vacate orders commanding the warden to produce an inmate to testify for the accused in a criminal proceeding. The majority based its decision partly upon Art I, § 11, of the Oregon Constitution:

"Under Art I, § 11, Oregon Const., the accused not only is guaranteed the right 'to meet the witnesses face to face', but also the right of having 'compulsory process for obtaining witnesses in his favor'.

"At common law an accused charged with a felony could not demand as a matter of right compulsory process for his witnesses, but it was the duty of the prosecution to call and examine all persons who had knowledge of material facts connected with the crime, whether favorable or unfavorable to the defendant. But under the federal constitution and the constitutions of most states, the right of compulsory process for witnesses on behalf of defendant is secured. The right is not subject to the discretion of the court; it is usually

---

· ⊕ If the trial court had denied the motion on the ground that it was not timely, we would have a different question.

⊘ State v. Blount, 200 Or 35, 264 P2d 419 (1953), cert den 347 US 962, 74 S Ct 711, 98 L Ed 1105, 44 ALR 711 (1954), is not to the contrary. The question in that case was whether the court had the power to order the state to advance funds for the payment of out-of-state witness fees and travel expenses. The Court stated that even if that was required on behalf of an indigent defendant, the defendant had not shown such poverty.

absolute, at least as to process for necessary and material witnesses, even though the persons needed as witnesses live outside the county of the venue.

"* * * * * *

"The right to compulsory process for necessary and material witnesses on his behalf is a valuable right guaranteed to an accused. It is a right that cannot be denied by legislative act or failure to act. In the interests of justice, it is the duty of courts to enforce the right. When all is said and done, in every criminal proceeding, as well as in the trial of all other cases, the primary aim of the law is to arrive at the truth of the matter in controversy, and no obstacle should be sanctioned that would deny the presence of a competent witness who has knowledge of material facts." 201 Or at 188–189.

Mr. Justice LUSK specially concurred upon the sole ground that the accused had a right to have the inmate produced under the compulsory process portion of Art I, § 11, of the Oregon Constitution:

"* * * The accused has no need of any other constitutional guaranty of the right to have his own witnesses seen and heard by the jury than the guaranty, also found in Art I, § 11, of the right 'to have compulsory process for obtaining witnesses in his favor'. This means the right to invoke the aid of the law to compel personal attendance at the trial of witnesses within the jurisdiction of the court. * * *." 201 Or at 195.

In *Washington v. Texas*, 388 US 14, 87 S Ct 1920, 18 L Ed2d 1019 (1967), the Sixth Amendment guarantee of compulsory process was made applicable to the states through the Fourteenth Amendment upon the ground that this guarantee is a fundamental element of due process.

We hold that the trial court erred in denying the

defendant's motion. The presence of these witnesses may have changed the outcome of the case and the error of not ordering their attendance requires reversal.

## III

In the event of a new trial, the trial court may again be called upon to resolve issues which concern other assignments of error in this appeal; therefore, we will comment upon them.

The defendant was convicted of violating ORS 163.635(1), which provides:

"A prisoner in the Oregon State Penitentiary or Oregon State Correctional Institution who wilfully holds a person as a hostage within such institution shall be punished upon conviction by imprisonment in the state penitentiary for a period of not more than 20 years."

The charge against the defendant arose out of a large, destructive riot in the state prison. The jury could have found that the defendant participated in the commencement of the riot. Approximately eight hours after the commencement of the riot some of the employees of the prison were under the bleachers in the recreation yard. The defendant relieved another inmate and, armed with a razor and knife, stood guard over the employees. The defendant testified that the employees could have left at any time they desired and his purpose in being there was to protect the employees from drunken and drugged inmates who were in the area. The state contends the defendant and others were holding such employees against their will and not for the purpose of protecting them.

■ The defendant moved for an acquittal upon the ground that there was no evidence from which a jury

could find that he was holding the employees as hostages. The defendant contends that holding as a hostage means holding a person as security for the performance of any demand.

The parties have offered no legislative history concerning the use of the word "hostage" in ORS 163.635, and the term has not been previously defined by this court. The defendant urges that the statute be construed to incorporate the definition of hostage attributed in his brief to the Oxford English Dictionary:

> "Pledge or security given to enemies or allies for the fulfilment of any undertaking by the handing over of one or more persons into their power; the standing, state or condition of the person thus handed over."

The defendant asserts that the state failed to prove that the defendant took a hostage, because there was no evidence that the defendant demanded anything in exchange for the release of the captive guards.

■ ORS 161.050 requires this court to construe penal statutes "according to the fair import of their terms with a view to effect their objects and to promote justice." A reasonable and sensible construction of ORS 163.635 strongly suggests that the evil legislated against in that provision is the forcible holding of prison employees by prison inmates for the purpose of exploiting the captives. As written, the statute gives fair warning of this purpose. It is not likely that the Legislative Assembly had in mind the military or diplomatic uses of the word hostage. Accordingly, the statute should not be interpreted so narrowly as to deprive it of practical meaning.

It is not necessary that the prison inmate, to vio-

late ORS 163.635, communicate his purpose or intent in taking and holding captives.

Holding a person prisoner in circumstances other than a prison riot could be for a variety of purposes; however, in a prison riot when an inmate holds a prison employee prisoner and not for the employee's own protection, the jury could infer that beyond a reasonable doubt the inmate's intent was to hold the employees prisoner to gain an advantage. We conclude that in the context of the evidence the jury could infer beyond a reasonable doubt that the defendant was holding the employees for exploitation.

■ The motion for acquittal was properly denied. In the event of a new trial, however, the jury should be instructed to the effect that it cannot convict unless it finds that the captives were held by the inmates for an exploitive purpose by the inmates.

Reversed and remanded.

PERRY, C. J., concurring in part; dissenting in part.

The defendant Timothy Earl Gann was indicted and convicted of violating ORS 163.635. From the judgment of conviction defendant appeals.

ORS 163.635 reads as follows:

"(1) A prisoner in the Oregon State Penitentiary or Oregon State Correctional Institution who wilfully holds a person as a hostage within such institution shall be punished upon conviction by imprisonment in the state penitentiary for a period of not more than 20 years.

"(2) If a person is being held as a hostage in the Oregon State Penitentiary or Oregon State Correctional Institution by a prisoner and is killed as a result thereof, any prisoner who wilfully par-

ticipated in the killing of such person, is guilty of murder in the first degree.

"* * * * *"

The undisputed evidence is that about 4:00 p.m. on March 9, 1968, a riot started near the control room of the Oregon State Penitentiary after an inmate attacked an officer who had corrected him for moving out of the line of prisoners on their way to a cell block. The officers in and near the control room while trying to go to the aid of the officer attacked were overcome by other prisoners. The officers were all taken to a cell in E block and told to stay in there. About midnight a fire started in E block and the officers were taken from the cell by the prisoners to an area under the baseball bleachers in the recreational yard of the prison.

While the officers were in the recreational yard, the defendant and others were stationed there as guards.

There is no evidence that after the officers were taken prisoners any demands were made by the inmates upon any person as a condition for the release of the officers, or even why they continued to hold the prisoners, other than the evidence of the defendant that it was for the protection of the officers.

In the trial court, after both parties had rested, the defendant moved the court for a directed verdict of acquittal, which was denied. The trial court's denial of this motion is assigned as error.

The term "hostage" had its origin in international law and has been defined in this connection as follows:

"A person who is given into the possession of the enemy, in a public war, his freedom (or life)

to stand as security for the performance of some contract or promise made by the belligerent power giving the hostage with the other." Black's Law Dictionary 871 (rev 4th ed, 1968).

"A hostage, in international law, means a person given up to an enemy, as a security for the performance of a contract made between belligerent powers, or their subjects or citizens. See, 30 Corpus Juris." 19 Words and Phrases 662.

"* * * [A] person or sometimes a thing left as a pledge or surety for the performance of the articles or conditions of a treaty. The taking or giving of hostages is now scarcely known in the relations of modern communities, but was formerly almost universal, and many questions in the law of nations arose out of the practice. Writers on international law have discussed how far the rights of conquerors extend over hostages, what circumstances may release them from their obligation and what effect their escape will produce on the treaty proposed by the contracting parties." 14 Encyclopedia Americana 434 (1957).

The most modern definitions of the meaning of the word "hostage" are set forth in The American Heritage Dictionary of the English Language (1969) as "a person held as security for the fulfillment of certain terms;" and in Webster's Third New International Dictionary: "The state of a person given or kept as a pledge pending the fulfillment of an agreement, *demand* or treaty." (Emphasis supplied.)

It is clear, therefore, that the word "hostage," used in any context, is a word of art to describe the state of a person held captive, and connotes that the person so held is held for the purpose of requiring another to perform some act before his release can be effected.

I am, therefore, unable to agree with the cavalier treatment afforded ORS 163.635 by the majority.

While ORS 161.050, relied upon by the majority, relieved the courts from the common-law rule of strict construction of criminal statutes, it did not relieve the courts from being required to follow the cardinal rule in the construction of statutes to ascertain from the language *used* by the legislature what purpose was to be served, or what objective was to be obtained. *State v. Collis,* 243 Or 222, 413 P2d 53; *Appling v. Chase,* 224 Or 112, 355 P2d 631; *Swift & Co. and Armour & Co. v. Peterson,* 192 Or 97, 233 P2d 216. Nor did it permit the courts to extend the meaning of a penal statute to include any act not clearly and intelligibly described by words used therein. *State of Oregon v. Smith,* 198 Or 31, 255 P2d 1076. Nor does ORS 161.050 permit this court to legislate by either excising or extending beyond their *natural meaning* words used in the act. *State of Oregon v. Brantley,* 201 Or 637, 271 P2d 668; *State of Oregon v. Smith,* supra; *Union Pac. R.R. Co. v. Anderson,* 167 Or 687, 120 P2d 578.

ORS 163.635 was adopted verbatim from the state of Massachusetts, 19 MGLA, chap 127, § 38A. See minutes of committee hearings. Also at the hearing a discussion was had concerning defining "hostage" and it was thought unnecessary.

Other states (and their statutes were undoubtedly consulted by the committee) which intend to enlarge the scope of the crime to include the holding of an officer against his will or for some purpose other than as a "hostage", so state or use other suitable language such as "to prevent the officer from performing his official duties."

Fla. St. Ann. § 944.44: holds person as a "hostage" or "holds any person or persons against their will."

Rev. Code Wash Ann, 9.94.030: holds a person as

a "hostage" or shall prevent the officer from performing his official duties.

Pa Stat Ann, tit 18, § 4723.1: whenever any prisoner takes "any person as a hostage, or for any other reason," he is guilty of a felony.

It is common knowledge that on many occasions prison inmates have seized officers and held them prisoners in order to enforce their demands upon the prison officials. Certainly for this court to assume that the legislature did not intend to use the word "hostage" in its ordinary meaning in two places in the statute is unmitigated license.

Even under the definition of "hostage" adopted by the majority there is no evidence in this case that would sustain the judgment.

There is not the slightest evidence of what, if any, advantage the inmate gained or was purported to have gained by the holding of the officers. This fact is admitted by the majority, but to supply this necessary proof they argue that, because there was a riot in progress, the jury could infer from this fact alone beyond a reasonable doubt the holding was for the purpose of exploitation.

"An inference is a deduction which the reason of the jury makes from the facts proved * * *." ORS 41.320.

In this case, there is only a showing that a riot was in progress. With no other facts to show the purpose of the holding of the captives, I am unable to understand how this court can permit a jury to speculate on the unexpressed mental purpose of this defendant. Inferences may only be drawn from established facts which tend to show that purpose. Certainly no one would contend that solely on evidence

that a strange man forceably struck a woman on the street that a conviction for assault with intent to commit rape could be sustained.

For the above reasons I would reverse this judgment with instructions to enter a verdict of not guilty.

I concur in the majority's opinion in all other respects.

GOODWIN, J., concurring in part and dissenting in part.

I dissent only from that part of the majority opinion which refuses to apply the federal interpretation of the Sixth Amendment to the State of Oregon.

For the first seventy-five years of its history, Oregon, in company with all the states except Louisiana, required a unanimous verdict in felony cases. Then, in 1934, the people of Oregon amended Article I, § 11, of the state constitution. The principal reason stated for the amendment was that its adoption would tend to eliminate the evil of the hung jury and the consequent expense of the new trial.[①] There was no organized opposition to the referendum, and it passed. As noted by the majority, there was little reason to question the federal constitutionality of the 1934 amendment until *Maxwell v. Dow*, 176 US 581, 20 S Ct 448, 44 L Ed 597 (1900), was overruled by *Duncan v. Louisiana*, 391 US 145, 88 S Ct 1444, 20 L Ed 2d 491 (1968).

*Duncan v. Louisiana*, supra, has now held that trial by jury is fundamental to the American scheme

---

[①] The possibility that there might be a corrupt juror is sometimes tendered as an additional reason for eliminating the requirement of unanimity. See Kirkpatrick, *Should Jury Verdicts Be Unanimous in Criminal Cases?*, 47 Or L Rev 417, 421 (1968), for a well-reasoned statement of the case for unanimity.

of justice and that the Due Process Clause of the Fourteenth Amendment guarantees trial by jury to criminal defendants in state courts. While the court in *Duncan v. Louisiana* stopped short of a specific holding that a jury trial in a state court must be conducted according to federal standards, a subsequent per curiam opinion dealing in part with an Oregon case strongly suggests that state trials commenced after the date of *Duncan* must conform to federal standards, one of which requires a unanimous verdict to convict. *De Stefano v. Woods*, 392 US 631, 88 S Ct 2093, 20 L Ed 2d 1308 (1968).

When a state's own constitution is challenged as repugnant to the federal constitution, the state court should lay aside its presumptions favoring the constitutionality of statutes generally, and decide the federal supremacy question in light of the controlling precedents of the United States Supreme Court. See, e.g., *Reitman v. Mulkey*, 387 US 369, 87 S Ct 1627, 18 L Ed 2d 830 (1967). Accordingly, I believe the time has arrived for Oregon to recognize that the right to a unanimous jury verdict in a criminal trial is so fundamental to liberty under the American scheme of justice as to amount to a due-process right. I believe that our state constitution is out of step with the United States Constitution as the Sixth Amendment has been interpreted by the United States Supreme Court.

In contrast to the Oregon amendment allowing a verdict by a jury which contains unconvinced jurors, the federal system has always regarded the unanimous verdict as an essential ingredient of the Sixth Amendment's guarantee of a jury trial. *Thompson v. Utah*, 170 US 343, 350-351, 18 S Ct 620, 623, 42 L Ed 1061, 1066-1067 (1898) ; *Maxwell v. Dow*, 176 US at 586, 20

S Ct at 450-451, 44 L Ed at 599; *Patton v. United States*, 281 US 276, 288, 50 S Ct 253, 254, 74 L Ed 854, 858, 70 ALR 263 (1930); *Andres v. United States*, 333 US 740, 748, 68 S Ct 880, 884, 92 L Ed 1055, 1065 (1948).

The origin of the unanimity rule is not universally agreed upon. However, it is undisputed that for more than five centuries Englishmen knew that they could not be convicted of crime except by the unanimous verdict of twelve peers.[2] 1 W. Holdsworth, History of the English Law 318 (3d ed rewritten 1922). Moreover, by the time of the American Revolution, the protection of unanimity in criminal cases was one of the Englishman's most cherished rights. See 4 Blackstone, Commentaries *349-*350. And see W. Forsyth, History of Trial by Jury 210-215 (new ed Morgan 1876); M. Hale, History of the Common Law 293 (and note at 299) (Runnington ed 1779); J. Thayer, Preliminary Treatise on Evidence at the Common Law (1898).

There is no reason to believe that the American colonists who adopted our Bill of Rights abandoned their English tradition with respect to trial by jury. Indeed, the evidence strongly suggests that the Sixth Amendment guarantee of a jury trial in all criminal

---

[2] Recent legislation in England provides for a ten-to-two verdict in criminal cases. Criminal Justice Act of 1967, § 13. According to H. Kalven & H. Zeisel, *The American Jury: Notes for an English Controversy*, 48 Chi B Rec 195 (1967); Introductory Note, the legislation was the result of a discovery that there had been jury bribery in a few widely publicized criminal cases. This change was also suggested in this country in ALI Code of Criminal Procedure, § 355 (1931). However, with regard to felony cases, it was rejected in all the American common-law jurisdictions except Oregon. See the equivocal comments to Section 1.1(d) of the American Bar Association Standards Relating to Trial by Jury (Approved Draft 1968).

cases was intended to incorporate all the elements of a jury trial that were deemed protective of individual liberty in this country and in England when the Constitution was adopted.

> "*   *   * Those elements were—(1) that the jury should consist of twelve men, neither more nor less; (2) that the trial should be in the presence and under the superintendence of a judge having power to instruct them as to the law and advise them in respect of the facts; and (3) that the verdict should be unanimous." *Patton v. United States,* 281 US at 288.

And see *Andres v. United States,* 333 US 740; *Maxwell v. Dow,* 176 US 581; *Thompson v. Utah,* 170 US 343; all supra.

Several important functional advantages result from the unanimity rule. If at least one juror disagrees with the majority, his opinion and the reasons for it must be heard and considered by the majority. He cannot be ignored, because until the majority persuades him to accept their view no verdict can be returned. This undoubtedly decreases the likelihood of precipitancy and increases the opportunity for a full and adequate discussion of every issue about which there is reasonable doubt. Kalven & Zeisel, *The American Jury: Notes for an English Controversy,* 48 Chi B Rec 195, 201 (1967).

A guilty verdict in which only a majority of the jury can concur strongly suggests that the jury contains persons who are not convinced of the prisoner's guilt. Indeed, it may contain jurors who are firmly convinced of the person's innocence. These unpersuaded jurors may be merely incorrect; or they may be less susceptible to passion and prejudice than the majority, and therefore correct. It was to this latter

point that Mr. Justice Story referred when he added the following footnote to a discussion of the reason for the institution of trial by jury:

> "A trial by jury is generally understood to mean * * * a trial by a jury of *twelve* men, impartially selected, who must *unanimously* concur in the guilt of the accused before a legal conviction can be had. Any law, therefore, dispensing with any of these requisites, may be considered unconstitutional." 2 J. Story, Commentaries on the Constitution of the United States § 1779, note 2 (5th ed 1891).

Judge Story said that the "object of trial by jury in criminal cases is, to guard against a spirit of oppression and tyranny on the part of rulers, and against a spirit of violence and vindictiveness on the part of the people. Indeed, it is often more important to guard against the latter than the former * * *." Id. at § 1780. Thus, because it requires the concurrence of the unimpassioned and the unprejudiced, the protection of unanimity increases the likelihood that the guilt of the accused will truly be established beyond a reasonable doubt.

The distinction between liberty and property has made some commentators, such as W. Forsyth, oppose the unanimity rule in civil cases, but wholeheartedly endorse it in criminal cases. W. Forsyth, supra at 210.

It may be argued that the state no longer prosecutes religious and political heretics, or at least that political and religious dissent is protected by the First Amendment, and that the citizen no longer needs the additional guarantee of his liberty which is provided by the unanimous jury.

Similarly, it may be argued that the criminal defendant in modern times has so many other constitutional protections that, regardless of the nature of the crime of which he is charged, he need have no fear of an unjust verdict by a majority of twelve of his fellow citizens so long as the jury is impartial.

It has been argued, as noted, that the requirement of unanimity allows irrational, perverse, or dishonest jurors to "hang juries," thereby obstructing justice and putting the state to the unnecessary expense of multiple trials. This argument, however, is unsupported by objective data, even though 48 states and the federal judicial system refused to follow Oregon's lead and have adhered to the unanimous-verdict rule.

However, assuming some validity in one or more of the arguments against unanimity, the fact remains that if a citizen can be convicted by only a majority (or, in Oregon, by a statutory fraction) of the jury, he has less protection than he had at common law. If Oregon can constitutionally provide for a ten-to-two verdict, it can, with equal constitutionality, provide for a verdict by a simple majority.

A local law making it easier for the state to convict is not necessarily bad. But a local law which deprives a person of a right that is fundamental to due process of law cannot stand. Since the only kind of verdict recognized by courts operating under the Federal Constitution is the unanimous verdict, I am forced to conclude that unanimity has been held to be fundamental to federal due process. If there is no federal constitutional requirement of unanimity, there is, of course, no federal standard at all, except "fair procedure," for measuring the compliance of the various states with the demands of due process. I find it

difficult to believe that the United States Supreme Court will permit fifty states to decide for themselves what constitutes a Sixth Amendment trial by jury.

Neither this court nor the United States Supreme Court has ever departed from common-law antecedents in order to take away a constitutional safeguard of personal liberty. It is true that we no longer insist that a jury be made up of male white property owners. But none of those common-law qualifications for jury service evolved to protect individual liberty. The unanimity rule is related directly to liberty.

In 1967, this court summarily denied habeas corpus relief to Frank Anthony Carcerano, who had belatedly challenged his 1962 conviction of armed robbery on the ground that the jury had been instructed on the ten-to-two verdict, in violation of the Federal Constitution. Before the United States Supreme Court on a petition for a writ of certiorari to the Supreme Court of Oregon, Carcerano subsequently advanced the argument that the Oregon jury trial had denied him due process of law under the United States Constitution. The United States Supreme Court granted certiorari, but eventually held that it need not decide the constitutional question in Carcerano's case because Carcerano had been tried before the publication of the decision in *Duncan v. Louisiana,* supra. *De Stefano v. Woods,* supra. In view of the specific holding that *Duncan v. Louisiana* is not retroactive, and in view of strong suggestions in *De Stefano v. Woods* and more recently in *DeBacker v. Brainard,* 396 US 28, 90 S Ct 163, 24 L Ed 2d 148 (1969), that *Duncan v. Louisiana* would apply to future cases like the one at bar, I would prefer a decision today granting new trials in those relatively few cases in which guilty verdicts

were rendered by divided juries after May 20, 1968, the date of the decision in *Duncan v. Louisiana,* supra. The majority is inviting a wholesale jail delivery several years from now if the United States Supreme Court adheres to the policy considerations recently applied in *Desist v. United States,* 394 US 244, 249, 89 S Ct 1030, 22 L Ed 2d 248 (1969), and holds that Oregon has been bound by *Duncan v. Louisiana* since the date it was decided.

I dissent, therefore, from the part of the majority opinion upholding the ten-to-two verdict.

McALLISTER and O'CONNELL, JJ., join in this concurring and dissenting opinion.