Argued and submitted June 7, 1990; reassigned November 3, 1992, judgments of conviction affirmed; sentences for robbery and burglary vacated; sentences of death vacated and case remanded to circuit court for further proceedings February 11, reconsideration denied April 20, 1993

## STATE OF OREGON,
*Respondent,*

*v.*

## MICHAEL ROBERT TUCKER,
*Appellant.*

### (CC 87P-3440; SC S35724)

845 P2d 904

Rodney W. Miller, Judge.

Phillip M. Margolin, Portland, argued the cause and filed the brief for appellant.

Brenda J Peterson, Assistant Attorney General, Salem, argued the cause for respondent. On the brief were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, and Jonathan H. Fussner, Assistant Attorney General, Salem.

GRABER, J.

Unis, J., filed a concurring opinion, in which Gillette and Van Hoomissen, JJ., joined.

Fadeley, J., filed a dissenting opinion.

## GRABER, J.

A jury convicted defendant of ten counts of aggravated murder, ORS 163.095,[1] for the deaths of Barbara and Robert Farmer. The jury also convicted defendant of two counts of robbery in the first degree, ORS 164.415,[2] and one

---

[1] ORS 163.095 provides in part:

"As used in * * * this section, 'aggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"(1) * * *

"(d) There was more than one murder victim in the same criminal episode * * *.

"(2) * * *

"(d) Notwithstanding ORS 163.115(1)(b), the defendant personally and intentionally committed the homicide under the circumstances set forth in ORS 163.115(1)(b).

"(e) The murder was committed in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime."

ORS 163.115(1)(b) provides:

"[C]riminal homicide constitutes murder:

"* * * * *

"(b) When it is committed by a person, acting either alone or with one or more persons, who commits or attempts to commit any of the following crimes and in the course of and in furtherance of the crime the person is committing or attempting to commit, or during the immediate flight therefrom, the person, or another participant if there be any, causes the death of a person other than one of the participants:

"* * * * *

"(C) Burglary in the first degree * * *;

"* * * * *

"(G) Robbery in the first degree * * *[.]"

Counts 1 through 5 related to the murder of Barbara Farmer, as follows: count 1 was for aggravated murder (multiple victims); count 2 was aggravated felony murder (underlying felony of burglary); count 3 was aggravated felony murder (underlying felony of robbery); count 4 was aggravated murder to conceal the identity of the perpetrator of a crime (burglary); and count 5 was aggravated murder to conceal the identity of the perpetrator of a crime (robbery). Counts 6 through 10 stated the same theories with respect to the murder of Robert Farmer.

[2] ORS 164.415 provides:

"(1) A person commits the crime of robbery in the first degree if the person violates ORS 164.395 [defining the crime of robbery in the third degree] and the person:

"(a) Is armed with a deadly weapon; or

"(b) Uses or attempts to use a dangerous weapon; or

"(c) Causes or attempts to cause serious physical injury to any person.

"(2) Robbery in the first degree is a Class A felony."

count of burglary in the first degree, ORS 164.225,[3] arising out of the same criminal episode.

After the jury answered in the affirmative the penalty-phase questions submitted to it in accordance with ORS 163.150(1)(b) (1987),[4] the trial court merged the five aggravated murder counts relating to the murder of Barbara Farmer into one count, did the same for the five aggravated murder counts relating to the murder of Robert Farmer,[5] entered judgments of conviction, and sentenced defendant to death on those two counts, as provided in ORS 163.150(1)(e) (1987).[6] The court sentenced defendant to separate terms of

---

[3] ORS 164.225 provides:

"(1) A person commits the crime of burglary in the first degree if the person violates ORS 164.215 [defining the crime of burglary in the second degree] and the building is a dwelling, or if in effecting entry or while in a building or in immediate flight therefrom the person:

"(a) Is armed with a burglar's tool * * * or a deadly weapon; or

"(b) Causes or attempts to cause physical injury to any person; or

"(c) Uses or threatens to use a dangerous weapon.

"(2) Burglary in the first degree is a Class A felony."

[4] ORS 163.150(1)(b) (1987) provided:

"Upon the conclusion of the presentation of the evidence [in the sentencing proceeding], the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. In determining this issue, the court shall instruct the jury to consider any mitigating circumstances offered in evidence, including but not limited to, the defendant's age, the extent and severity of the defendant's prior criminal conduct and the extent of the mental and emotional pressure under which defendant was acting at the time the offense was committed; and

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased."

Because defendant made no claim of provocation by his victims, the court did not submit the third question to the jury.

The statute was amended in 1989 to add a fourth question in accordance with the decision of the Supreme Court of the United States in *Penry v. Lynaugh*, 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989). Or Laws 1989, ch 790, § 135b.

[5] On appeal, the state argues that the aggravated murder counts should not have been merged. That argument was not made at trial, and we do not consider it further.

[6] ORS 163.150(1)(e) (1987) provided in part:

imprisonment on the two robbery counts and the burglary count and ordered that the sentences imposed for those counts run consecutively.

The case is before this court on automatic and direct review under ORS 163.150(1)(f) (1987).[7] We affirm the convictions for aggravated murder, vacate the sentences for robbery in the first degree and burglary in the first degree, vacate the sentences of death, and remand the case to the circuit court for further proceedings.

## SUMMARY OF FACTS

Because the jury found defendant guilty, we view the evidence in the light most favorable to the state. *State v. Stevens*, 311 Or 119, 121, 806 P2d 92 (1991). On the afternoon of October 23, 1987, defendant and his accomplice, Bryan Mikesell, drove defendant's pick-up truck to an orchard near the Farmers' home in Rickreall. Defendant and Mikesell waited in the orchard until dark and then approached the house. Defendant entered the house through the back door, armed with a handgun that he had brought with him.

Inside the house, defendant observed Robert Farmer in bed in one of the bedrooms, playing cards, and Barbara Farmer in another bedroom, watching television. Defendant entered the bedrooms in turn and shot each of the victims once in the head. Defendant and Mikesell then removed various items of the victims' personal property from the house and placed those items in the victims' car and in defendant's pick-up. They drove both vehicles to defendant's apartment and unloaded some of the items. At that time, defendant described the killings to his girlfriend, with whom he shared the apartment.

---

"If the jury returns an affirmative finding on each issue considered under this section, the trial judge shall sentence the defendant to death."

(Amended and renumbered as ORS 163.150(1)(f) in substantially same language as quoted above.)

[7] ORS 163.150(1)(f) (1987) has been renumbered as ORS 163.150(1)(g) and provides in part:

"The judgment of conviction and sentence of death shall be subject to automatic and direct review by the Supreme Court."

Later, defendant, his girlfriend, and Mikesell drove the victims' car and defendant's pick-up to another location, transferred most of the remaining items into defendant's pickup, and abandoned the victims' car. In the following weeks, defendant mentioned the murders to his girlfriend almost daily and asked her to buy newspapers containing coverage of them. Defendant also threatened to kill her if she told anyone about the murders.

On December 2, 1987, defendant's girlfriend told police about defendant's participation in the murders and allowed police to search the apartment where she and defendant lived. Later that day, defendant was arrested. While defendant was being held in the Polk County Jail, he had conversations about the murders with other inmates.

On appeal, defendant raises numerous assignments of error. Most of them relate to the penalty phase of the trial. We will combine our discussion of assignments of error that present similar questions.

## GUILT-PHASE ASSIGNMENTS OF ERROR

### Pre-Trial Motions

Defendant contends that it was error under ORS 135.405 and 135.415, Article I, section 20, of the Oregon Constitution,[8] and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States[9] for the trial court to deny his pre-trial motion to compel the state to offer him the same plea agreement opportunity as was afforded to his accomplice and codefendant, Mikesell. We address defendant's statutory claim first. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (court decides questions of state law before reaching constitutional issues).

---

[8] Article I, section 20, of the Oregon Constitution provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

[9] The Fourteenth Amendment to the Constitution of the United States provides in part:

"No State shall * * * deny to any person within its jurisdiction the equal protection of the laws."

■ ■ ORS 135.405(4) states that "[s]imilarly situated defendants should be afforded equal plea agreement opportunities." ORS 135.415 sets forth non-exclusive criteria that a district attorney may consider in deciding whether to engage in plea discussions with a defendant. *See State v. McDonnell*, 313 Or 478, 492, 837 P2d 941 (1992) (in deciding whether to extend to a defendant an opportunity to negotiate a plea agreement, the district attorney is not limited to consideration of factors enumerated in ORS 135.415). This court reviews whether a defendant was improperly denied a plea offer for an error of law. *Id.* at 484.

At the hearing on defendant's motion, the state gave three reasons for its position that defendant and Mikesell were not "similarly situated" within the meaning of ORS 135.405: the fact that defendant, who was accused of personally committing the murders, was charged with aggravated murder, whereas Mikesell was charged with felony murder; the fact that defendant had an extensive criminal record, whereas Mikesell did not; and the fact that the state had "a number of" witnesses who would testify as to the "character and propensity" of defendant, whereas it had found none to give similar testimony regarding Mikesell. We conclude that the record is sufficient to support the trial court's finding that the district attorney's decision to treat defendant and his codefendant differently did not violate ORS 135.405.

■ Neither was the district attorney's decision constitutionally impermissible under Article I, section 20. In deciding whether to afford a defendant an opportunity to reach a plea agreement, the district attorney "must exercise his discretion in a manner that adheres to sufficiently consistent standards to represent a coherent, systematic policy." *State v. McDonnell, supra*, 313 Or at 491. On the record here, the trial court was entitled to conclude that the district attorney adhered to a coherent, systematic policy.

The trial court also was entitled to conclude, on this record, that the district attorney's decision was not prompted by any impermissible discriminatory motive. *See State v. Farrar*, 309 Or 132, 140-41, 786 P2d 161 (1990) (decision not to engage in plea negotiations with a particular defendant based on, for example, class discrimination violates Article I,

section 20, and Equal Protection Clause). The district attorney offered a neutral and rational justification for treating defendant differently than Mikesell.

The district attorney's decision to treat defendant and Mikesell differently did not violate defendant's rights under Article I, section 20, of the Oregon Constitution.

For the same reasons, we conclude that there was no violation of the Equal Protection Clause of the Fourteenth Amendment to the federal constitution. This court has held that compliance with Article I, section 20, with respect to a decision not to offer a plea agreement, demonstrates compliance with the Equal Protection Clause as well. *State v. McDonnell, supra*, 313 Or at 492-93. The trial court did not err in denying defendant's motion to compel the state to offer a plea agreement.

*Jury Selection*

■ Defendant argues that the trial court erred in denying his motions to excuse for cause two jurors, Young and Campbell. Young's wife was a nurse at the jail where defendant was held and had given him medication. Campbell was acquainted, through membership in the same church, with Polk County Detective Manning, who testified at trial.

■ Defendant does not claim that those jurors should have been excused for implied bias under ORS 136.220. Therefore, the issue is whether the jurors actually were biased. Whether a juror actually is biased is a question of fact to be determined by the trial court in the exercise of its discretion. ORCP 57D(1)(g); *State v. Montez*, 309 Or 564, 574-75, 789 P2d 1352 (1990). A trial court's determination that the jurors in a case will be impartial is entitled to "great weight," and the court's decision will not be disturbed unless it was an abuse of discretion. *State v. Rogers*, 313 Or 356, 364-65, 836 P2d 1308 (1992).

There was ample evidence in this record to support the trial court's conclusion that jurors Young and Campbell would be fair and impartial. It would serve no purpose to detail that evidence here. The trial court did not err in denying defendant's motions to excuse jurors Young and Campbell for cause.

## Trial

■ Defendant asserts that the trial court erred in permitting the prosecutor, during closing argument, to "argue about evidence which had been stricken from the record." At trial, the state called as witnesses defendant's cellmate at the Polk County Jail, Tsow, and another inmate at the jail, Hutchison. During the state's direct examination of Tsow, the following exchange took place:

> "[PROSECUTOR]: Okay. In his conversations with the group that you heard, did [defendant] ever indicate whether this was some sort of accident that they were shot?
>
> "[WITNESS]: No.
>
> "[PROSECUTOR]: What did he — what did he say to you in that regard?
>
> "[WITNESS]: He told me he shot them both point blank. And he seemed real proud of the fact that he did that.
>
> "[DEFENSE COUNSEL]: I'm going to object to the characterization of that, Your Honor.
>
> "[THE COURT]: Sustained. That characterization will be stricken from the record. I instruct the jury to disregard that last remark."[10]

During the state's closing argument, the following colloquy occurred:

> "[PROSECUTOR]: After his arrest, [defendant] was lodged in the Polk County Jail. While he was there, he told fellow inmates about the murders, not so much talking about them as bragging about them, according to [Hutchison and Tsow].
>
> "[DEFENSE COUNSEL]: Excuse me, Your Honor. But I do have an objection. That testimony was specifically ordered stricken from the record, about the bragging.
>
> "[THE COURT]: The jury will have to rely on their own recollection. I don't know that it was stricken. I just can't remember. You may proceed."

On appeal, defendant argues that the prosecutor's remark that defendant was "bragging" about the murders referred to the stricken testimony quoted above. That is not

---

[10] We express no view as to the correctness of the trial court's ruling.

necessarily so, because there was substantial additional evidence to which the prosecutor's remark could have referred and because the prosecutor's remark did not use any of the words of the stricken testimony.

Tsow also testified, without objection, that defendant "said that he had, he himself had [killed Mr. and Mrs. Farmer]. * * * He said he did that by himself." Hutchison testified that defendant talked about the killings on "[m]ore than one occasion" and that defendant said that he killed the Farmers "on purpose" and "that he meant to kill them." Finally, Hutchison testified that defendant told him that the murders were "kind of like a mercy killing, that [the victims] had heart bypasses and cancer," that the victims were "in bad shape, they were bedridden and that they were almost dead anyways."

The Random House Dictionary of the English Language 252 (2d ed 1987) defines the word "brag" as "to use boastful language; boast." The word "boast" is defined, in turn, as "to speak with exaggeration and excessive pride." *Id.* at 231. The testimony of Tsow and Hutchison to which defendant did not object fairly may be described as "bragging," because a jury fairly could agree with the prosecutor's characterization that defendant boasted and spoke with exaggeration and excessive pride about what he had done. The trial court did not err in permitting the argument.[11]

---

[11] Even if the prosecutor's use of the word "bragging" did refer to the stricken ᵗony, the trial court gave adequate cautionary instructions. When defense ᵈl objected to the prosecutor's argument, the trial court said:

"[THE COURT]: The jury will have to rely on their own recollection. I don't ᵗow that it was stricken. I just can't remember. You may proceed."

A losing arguments, the court instructed the jury in part:

"[THE COURT]: Ladies and gentlemen, it is your sole responsibility to ᵃke all the *decisions* about the facts in this case.

"* * * * *

"When the Court has sustained objections to evidence or ordered that dence be stricken or excluded from your consideration, you must follow the urt's rulings. You must not consider such matters during your deliberations. ur verdict should be based only upon the evidence and these instructions. The torneys' statements and arguments are not evidence. If your recollection of the ᵛidence is different from the attorneys' recollection, you must rely upon your ᵂn memory."

Def ᵈdant did not request any additional cautionary instructions.

*Sentencing*

■ Defendant argues, and the state concedes, that the trial court erred in imposing separate sentences for the robbery and burglary convictions. We accept the concession.

A defendant may be punished separately for conduct or a criminal episode that violates two or more statutory provisions only if the following conditions are met: (1) the defendant engaged in acts that were the same conduct or criminal episode; (2) the defendant's acts violated two or more statutory provisions; and (3) each statutory provision requires proof of an element that the others do not. ORS 161.062(1). This court has explained that those conditions are not met where one offense charged truly is a lesser included offense of another offense charged, that is, when the former has no elements not also present in the latter, even though the latter has additional elements not present in the former. *State v. Crotsley*, 308 Or 272, 279-80, 779 P2d 600 (1989).

Under the language of counts 2, 3, 7, and 8 of the indictment,[12] robbery and burglary were lesser included offenses of aggravated felony murder. The trial court therefore erred in sentencing defendant separately on those convictions. The sentences for robbery in the first degree and burglary in the first degree are vacated.

## PENALTY-PHASE ASSIGNMENTS OF ERROR

*Mitigating Evidence*

■ Defendant argues that the trial court gave instructions to the jury in the penalty phase that unconstitutionally limited the way in which the jury could consider mitigating evidence about him. The state concedes, and we agree, that defendant is correct in the light of *State v. Wagner*, 309 Or 5, 786 P2d 93 (1990) (*Wagner II*), and the decision of the Supreme Court of the United States in *Penry v. Lynaugh*, 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989), which were decided after the trial in this case. We therefore vacate defendant's sentence of death and remand the case to the circuit court for a new penalty-phase proceeding or, at the

---

[12] *See* note 1, *ante*, for a description of the indictment. Defendant was convicted on all 10 counts of aggravated murder.

election of the district attorney, for entry of a sentence of life imprisonment. *Wagner II, supra,* 309 Or at 20; *State v. Williams,* 313 Or 19, 42, 828 P2d 1006, *cert den* ___ US ___, 113 S Ct 171, 121 L Ed 2d 118 (1992); *State v. Stevens, supra,* 311 Or at 148.

Although we remand the case to the circuit court for a new penalty-phase proceeding on the basis of the court's failure to instruct the jury to answer the constitutionally required "fourth question," we discuss some of defendant's other penalty-phase assignments of error that were preserved and that are likely to arise on remand.

### *Jury Instructions*

■ In two assignments of error, defendant argues that the trial court erred in refusing to instruct the jury that, by answering the dispositional sentencing questions, ORS 163.150(1)(b) (1987), the jury made "the ultimate decision" whether defendant would live or die. We are not persuaded.

■ The trial court instructed the jury that, if it answered the questions in the affirmative, *"the law requires that the penalty shall be death"* (emphasis added) and that, if it answered either or both of the questions in the negative, "the law requires that the penalty shall be life imprisonment." Those instructions accurately conveyed to the jury its role in determining defendant's sentence. That was enough. It is not error for a trial court to refuse to give a requested instruction if the instruction given by the court, although not in the form requested, adequately covers the subject of the requested instruction. *State v. Leppanen,* 253 Or 51, 53, 452 P2d 172 (1969). *See also Laubach v. Industrial Indemnity Co.,* 286 Or 217, 225, 593 P2d 1146 (1979) (not error for trial court to refuse to give requested instructions that are given in substance or that are merely enlargements on instructions given). The trial court did not err in refusing to give defendant's requested jury instructions concerning the jury's role in determining defendant's sentence.[13]

---

[13] The dissenting opinion of Justice Fadeley contends that comments of the prosecutor and of the trial court, which preceded the giving of the correct instruction quoted above in the text, were error. 315 Or at 344-45. Defendant did not preserve that claimed error in the trial court. Neither are we persuaded that similar comments are likely to be made on remand.

■ Defendant next assigns as error the trial court's refusal to instruct the jury regarding several specific factors that it should consider in mitigation of his sentence. In particular, defendant asked the court to instruct the jury that it should consider defendant's good conduct in jail following his arrest, evidence that he was an abused child, evidence that he was a "loving father," evidence of his mechanical abilities and work habits, evidence that his criminal acts were a result of his use of alcohol and drugs, and evidence that, in committing the murders, defendant was under the "domination" of his accomplice, who had received a life sentence for the murders. If given by the trial court to the jury, those instructions would have constituted impermissible comments by the court on evidence received at trial. ORCP 59E;[14] *see also State v. Farrar, supra,* 309 Or at 178-79 (court did not err in refusing to instruct jury to consider evidence about the defendant's family environment and his substance abuse). The trial court did not err in refusing to give those requested instructions.

■ Next, defendant argues that the trial court erred in refusing to instruct the jury that it should consider as a mitigating factor the fact that defendant's prior conviction for manslaughter in the second degree in the state of Washington did not prove that defendant intentionally killed the victim in that case. The trial court instructed the jury that it should consider the "extent and severity" of defendant's prior criminal conduct. That was sufficient. *See State v. Leppanen, supra* (instruction given adequately conveyed substance of requested instruction); *Laubach v. Industrial Indemnity Co., supra* (similar). The trial court did not err in refusing to give defendant's requested jury instruction concerning his conviction for manslaughter.

■ Relying on the legal presumption that a person is innocent until proven guilty,[15] defendant next contends that

---

[14] ORCP 59E provides:

"The judge shall not instruct with respect to matters of fact, nor comment thereon."

ORCP 59E applies to the trial of criminal actions. ORS 136.330(1).

[15] Although defendant does not cite the statutes in these five assignments of error, this presumption is codified in ORS 10.096(6) and 136.415. ORS 10.095(6) provides in part:

the trial court erred in refusing to instruct the jury that there is a "presumption" that the answer to the dispositional sentencing questions, ORS 163.150(1)(b) (1987), is "no." Specifically, defendant argues that the trial court should have instructed the jury that "[t]he law presumes that [defendant] did not engage in conduct causing the death of the deceased deliberately and with the reasonable expectation that death of the deceased or another would result," that "[t]he law presumes that [defendant] will not commit criminal acts of violence in the future," and that "there is a presumption in this case that death is not the appropriate sentence for [defendant]."

This court has rejected the claim that jurors should be told to presume that a defendant will be nonviolent in the future. In *State v. Montez, supra,* the court stated:

"The trial court instructed the jury that the state must prove beyond a reasonable doubt that there was a probability defendant would commit criminal acts of violence that would constitute a continuing threat to society, thus informing the jury that the state had the burden of proof and of the standard of proof required. No more was required." 309 Or at 613 (citations omitted).

*See also State v. Douglas,* 310 Or 438, 451, 800 P2d 288 (1990) (same); *State v. Farrar, supra,* 309 Or at 178 (same).

Moreover, the trial court instructed the jury that the state had the burden of proof on all the statutory questions and that a juror could not vote "yes" on any statutory question unless the juror was convinced that the state had carried that burden of proof "beyond a reasonable doubt." No more was required. The trial court did not err in refusing to

---

"The jury, subject to the control of the court, in the cases specified by statute, are the judges of the effect or value of evidence addressed to them, except when it is thereby declared to be conclusive. They are, however, to be instructed by the court on all proper occasions:

"* * * * *

"(6) That in criminal cases a person is innocent of a crime or wrong until the prosecution proves otherwise, and guilt shall be established beyond reasonable doubt[.]"

ORS 136.415 provides:

"A defendant in a criminal action is presumed to be innocent until the contrary is proved. In case of a reasonable doubt whether the guilt of the defendant is satisfactorily shown, the defendant is entitled to be acquitted."

give the requested additional instruction on the presumption of innocence.

██ In another assignment of error, defendant, expressly relying on the presumption of innocence stated in ORS 10.095(6)[16] and on his right under the Fourteenth Amendment to the Constitution of the United States[17] to due process of law, argues that the trial court erred in not instructing the jury that defendant was "presumed to be innocent of all unadjudicated criminal conduct" and that the jury could consider evidence of unadjudicated criminal conduct in its penalty-phase deliberations only if it first found beyond a reasonable doubt that defendant had engaged in such conduct.

Defendant's statutory argument is unpersuasive. This court consistently has held that "ORS 163.150(1), which sets forth the evidence that may be considered in the penalty phase, is to be interpreted broadly, to include even unadjudicated bad acts." *State v. Smith, supra,* 310 Or at 29. *See also State v. Montez, supra,* 309 Or at 610-11 (penalty-phase jury does not decide a defendant's guilt or innocence of prior crimes; evidence of those crimes is admissible, because it is relevant to consideration of issue whether a defendant should receive the death penalty); *State v. Farrar, supra,* 309 Or at 174-75 (testimony about unadjudicated crimes and bad acts is admissible in penalty phase to help resolve issue of a defendant's future dangerousness); *State v. Moen, supra,* 309 Or at 73 (in answering penalty-phase questions, jury should have before it all relevant information about the defendant; evidence of a defendant's prior conduct, bad and good, is relevant to question of a defendant's future dangerousness). The presumption of innocence guaranteed to a criminal defendant by ORS 10.095(6) applies to the defendant's right to be presumed innocent of the crime with which the defendant is charged *in that proceeding.* ORS 10.095(6) did not entitle defendant to an instruction in his sentencing proceeding that

---

[16] ORS 10.095(6) is set out at note 15, *ante.*

[17] The Fourteenth Amendment to the Constitution of the United States provides in part:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law[.]"

the jury could consider his unadjudicated criminal conduct only if it found beyond a reasonable doubt that defendant had engaged in that conduct.

 Neither did consideration by the jury of defendant's unadjudicated criminal conduct violate defendant's rights under the Fourteenth Amendment to the Constitution of the United States. The test for whether a particular criminal procedure violates the Due Process Clause of the Fourteenth Amendment is whether the procedure is fundamentally fair, or whether a different procedure is necessary to prevent miscarriages of justice. *Duncan v. Louisiana*, 391 US 145, 88 S Ct 1444, 20 L Ed 2d 491 (1968); *see also Bartz v. State of Oregon*, 314 Or 353, 367-69, 839 P2d 217 (1992) (applying that test).

Here, the trial court instructed the jury that it could consider any mitigating circumstances received in evidence, including the "extent and severity of defendant's prior criminal conduct." ORS 163.150(1)(b) (1987). As previously noted, the trial court also instructed the jury that the state had the burden to prove "beyond a reasonable doubt" that the answer to each of the statutory sentencing questions was "yes." Defendant had the opportunity to explain or rebut the evidence of his conduct. ORS 163.150(1)(a). The consideration of defendant's unadjudicated criminal conduct by the jury without an instruction by the trial court that defendant was presumed innocent of engaging in that conduct was fundamentally fair and did not violate defendant's rights under the Fourteenth Amendment.

Because defendant's requested instruction on the presumption of his innocence in regard to unadjudicated criminal conduct was not required by either ORS 10.095(6) or the Due Process Clause of the Fourteenth Amendment, the trial court did not err in refusing to give that instruction.

 Finally, defendant argues that the trial court erred in refusing to instruct the jury that the term "criminal acts of violence," as used in ORS 163.150(1)(b)(B) (1987),[18] referred to a "relatively narrow" range of conduct likely to result in

---

[18] The statute is set out at note 4, *ante*.

physical injury to persons, including homicide, forcible rape, aggravated assault, and arson. We disagree.

ORS 163.150(1)(b)(B), which required the jury to consider the likelihood that defendant will commit such acts in the future, did not so limit the jury's inquiry. This court has held that ORS 163.150(1)(b)(B) reflected an intent that the information provided to a jury on the question of defendant's prior criminal conduct be "broad in scope." *State v. Moen, supra,* 309 Or at 72. Similarly, ORS 163.150(1)(b)(B) (1987) permitted a jury to consider as broad a range of possible future acts of criminal violence, as those words are commonly understood,[19] as it deems relevant in addressing the inquiry required of it by the statute. *See State v. Wagner,* 305 Or 115, 152, 752 P2d 1136 (1988) (*Wagner I*) (statutory term is not indefinite, because it restricts jury to consideration of acts of *criminal* violence). The trial court did not err in refusing to give defendant's requested jury instruction on specific criminal acts of violence.

*Constitutional Challenge to ORS 163.150*

Defendant makes numerous constitutional challenges to the Oregon death penalty statutes. This court has answered most of those arguments in *State v. Guzek,* 310 Or 299, 797 P2d 1031 (1990); *Wagner II, supra; State v. Montez, supra; State v. Farrar, supra; State v. Miranda,* 309 Or 121, 786 P2d 155 (1990); *State v. Moen, supra;* and *Wagner I, supra.* We briefly address one other.

■ Defendant argues that ORS 163.150 (1987) violated Article I, section 20, of the Oregon Constitution,[20] and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States,[21] because persons sentenced to life imprisonment eventually may have their sentences commuted, whereas persons sentenced to death and executed are denied that privilege. An attack under Article I, section 20, to the terms of a statute on its face has

---

[19] *See Jurek v. Texas,* 428 US 262, 278-79, 96 S Ct 2950, 49 L Ed 2d 929 (1976) (issues posed in sentencing proceeding similar to Oregon's have "common-sense core of meaning" that juries are capable of understanding) (White, J., concurring).

[20] Article I, section 20, of the Oregon Constitution, is set out in note 8, *ante.*

[21] The pertinent portion of the Fourteenth Amendment is set out in note 9, *ante.*

"generally been rejected whenever the law leaves it open to anyone to bring himself or herself within the favored class on equal terms." *State v. Clark*, 291 Or 231, 240-41, 630 P2d 810 (1981). Defendant had the opportunity under ORS 163.150 (1987) to bring himself within the favored class on equal terms with other citizens similarly situated. With respect to a claim of unequal administration of the statute, defendant's state constitutional claim fails unless the privilege of being eligible for a commuted life sentence — that is, the privilege of receiving a life sentence that is capable of being commuted — is offered or denied "to individual defendants, or to social, geographic, or other classes of defendants (apart from the 'classification' formed by the choice itself) purely haphazardly or otherwise on terms that have no satisfactory explanation." *State v. Edmonson*, 291 Or 251, 253-54, 630 P2d 822 (1981). Because ORS 163.150 (1987) itself established clear, rational, and definite criteria for determining whether a defendant should receive a life sentence or the death penalty, the statute was not unconstitutional under Article I, section 20, in the manner argued by defendant.

"This court often has stated that for most purposes analysis under Article I, section 20 and under the federal equal protection clause will coincide[.]" *State v. Clark, supra*, 291 Or at 243. In this case, we conclude that the same reasons why the challenged statute does not offend Article I, section 20, also suffice for it to survive scrutiny under the Fourteenth Amendment. Defendant has cited no decision of the Supreme Court of the United States that would suggest a contrary conclusion. ORS 163.150 (1987) did not violate the Equal Protection Clause of the Fourteenth Amendment in the way that defendant asserts.

## CONCLUSION

We have considered all remaining assignments of error and every argument made in support thereof. Any assignment or argument not discussed in this opinion either previously has been considered and rejected by this court, is not well taken, or is unlikely to recur on remand. We find no reversible error based on those assignments of error.

Because the jury was not asked the so-called "fourth question," however, defendant is entitled to a new penalty-phase proceeding.

The judgments of conviction are affirmed. The sentences for robbery and burglary are vacated. The sentences of death are vacated, and the case is remanded to the circuit court for further proceedings.

**UNIS, J.,** concurring.

I join in the opinion of the court, but write separately to comment on a trial court ruling that disallowed certain lay opinion testimony.

During the state's direct examination of Tsow, defendant's cell mate at Polk County Jail, the following colloquy occurred:

"[PROSECUTOR]: Okay. In his conversations with the group that you heard, did [defendant] ever indicate whether this was some sort of accident that they were shot?

"[WITNESS]: No.

"[PROSECUTOR]: What did he * * * say to you in that regard?

"[WITNESS]: He told me he shot them both point blank. And *he seemed real proud of the fact that he did that.*

"[DEFENSE COUNSEL]: I'm going to object to the characterization of that, Your Honor.

"[THE COURT]: Sustained. That characterization will be stricken from the record. I instruct the jury to disregard that remark." (Emphasis added.)

Although the majority chose not to comment on the correctness of the trial court's ruling concerning the witness's (Tsow's) characterization that I have emphasized above, 315 Or at 329 n 10, I wish to do so in order to provide a better understanding of the rules relating to lay opinion testimony.

OEC 701, which provides a liberal avenue for the admissibility of lay opinion testimony, *State v. Lerch*, 296 Or 377, 383, 677 P2d 678 (1984), permits the type of characterization expressed by Tsow. OEC 701 permits lay opinion testimony when each of the rule's standards for admissibility is satisfied.[1]

---

[1] OEC 701 provides:

"If the witness is not testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to those opinions or inferences which are:

The first standard articulated in OEC 701(1), which requires that the opinion or inference of a lay witness be "[r]ationally based on the perception of the witness," has two distinct limitations. The first limitation is the *personal knowledge requirement, i.e.*, the witness must have personal knowledge of the facts from which the opinion or inference is to be derived. *See* OEC 602[2] (lay witnesses precluded from testifying to facts unless they have personal knowledge of those facts).[3] The second limitation is the *rational connection requirement, i.e.*, there must be a rational connection between the opinion or inference and the perceived factual basis from which it derives. The rational connection requirement means only that the opinion or inference advanced by the witness is one which a normal person could form on the basis of the observed facts.[4] *See* 3 Weinstein's Evidence 701-18 (1992) (stating principle as to FRE 701, the federal counterpart to OEC 701, but using word "would" instead of "could"). *See also* Kirkpatrick, Oregon Evidence 421 (2d ed 1989) ("the 'rationally based' requirement means that the opinion must be one that a person could reasonably deduce from the perceived facts").[5]

The second standard for admissibility of lay opinion testimony — the *helpfulness standard* — is found in OEC 701(2), which provides that lay opinion testimony must be

---

"(1) Rationally based on the perception of the witness; and

"(2) Helpful to a clear understanding of testimony of the witness or the determination of a fact in issue."

[2] OEC 602 provides:

"Subject to the provisions of [OEC 703], a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness."

[3] "Whether a witness has personal knowledge is a question of conditional relevancy under [OEC] 104(2)." Kirkpatrick, Oregon Evidence 421 (2d ed 1989).

[4] If expertise is required to supply the rational link between the opinion or inference and the perceived facts, the opinion or inference will not be admissible unless the requirements for expert testimony under OEC 702 have been met.

[5] Whether an opinion or inference satisfies the rational connection requirement is a question for the court under OEC 104(1). Kirkpatrick, *supra*, at 421. *See also* M. Graham, Federal Practice and Procedure: Evidence 230-31, § 6631 (Interim ed) (stating same principle as to FRE 701, the federal counterpart to OEC 701).

"[h]elpful to a clear understanding of testimony of the witness or the determination of a fact in issue."[6] That the opinion or inference "embraces an ultimate issue to be decided by the trier of fact" does not affect its admissibility under OEC 701. OEC 704.[7]

Tsow's characterization satisfied OEC 701's standards of admissibility. Tsow had personal knowledge of the facts from which his characterization of defendant's attitude was derived, the characterization is one that a normal person could form on the basis of the perceived facts, and the characterization is helpful to a clear understanding of Tsow's testimony, as well as to the determination of a fact in issue in this case. The characterization provided the jury with information that it would not otherwise have had and was useful to the jury in performing its factfinding function. Defendant was charged with personally and intentionally killing two people. Tsow's "shorthand" description that defendant "seemed real proud of the fact that he [shot the victims point blank]" provided the jury with evidence from which it could infer that defendant acted with the requisite mental state (intent) and that the shootings were not attributable to accident, mistake, or negligence. *See State v. Wright*, 315 Or 124, 132, 843 P2d 436 (1992) (" '[p]eople often speak in the shorthand of opinions or conclusions, not in the form of a recitation of pure fact' ") (quoting *State v. Lichty*, 313 Or 579, 585, 835 P2d 904 (1992)); *State v. Lerch, supra*, 296 Or at 383 (referring to legislative commentary approving proposition in prior case that "a lay witness may testify as to what he has perceived by using a 'shorthand' description"). Thus, Tsow's characterization added something helpful to the description of defendant's statements about the shootings.[8]

---

[6] Whether the proffered opinion or inference satisfies the helpfulness standard is an issue for the court under OEC 104(1). Kirkpatrick, *supra*, at 421.

[7] OEC 704 provides:

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

[8]

"The Commentary also states that the legislature did not intend by adopting [OEC] 701 to make inadmissible any opinion previously admissible under Oregon law." Kirkpatrick, *supra*, at 427 (citing the statement in *State v. Broadhurst*, 184 Or 178, 196 P2d 407 (1948), *cert den* 337 US 906 (1949), that

As the majority concludes, there was evidence, other than Tsow's characterization of defendant's attitude about the shootings, to which defendant did not object from which the "jury fairly could agree with the prosecutor's characterization during argument that defendant boasted and spoke with exaggeration and excessive pride about what he had done." 315 Or at 330. The prosecutor's characterization was a permissible argument even without Tsow's testimony that the trial court disallowed. The prosecutor's characterization of defendant's "bragging" about the murders was based directly on the evidence that was allowed, or at least could reasonably have been inferred from that evidence. *See State v. Townsend*, 237 Or 527, 532, 392 P2d 459 (1964) (argument should be kept within the confines of the record); *Zimmerle v. Childers*, 67 Or 465, 473-75, 136 P 349 (1913) (counsel should in argument confine his remarks to the facts in evidence). The prosecutor's closing argument did not, therefore, step over the boundary of permissible comment. In reality, the fact that the trial court sustained defense counsel's objection and disallowed Tsow's characterization testimony placed defendant in a better position than he would have been in had the trial court allowed the testimony, because that stricken lay opinion testimony would have provided the jury additional evidence to support its finding that defendant acted with the requisite mental state (intent).

Gillette and Van Hoomissen, JJ., join in this opinion.

**FADELEY, J.,** dissenting.

Three important questions are before us in this case, in addition to the vacation of sentence and remand to the trial court required under *Wagner v. Oregon*, 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989).

The three questions are:

(1) Whether the remand should require resentencing only,

(2) whether, in an Oregon capital trial where the state seeks the death penalty, it is lawful to advise the jury, either during its selection or at the close of the trial,

---

another is upset, worried, and heartbroken as an example of a lay opinion held to be proper under prior Oregon law).

that "the jury does not decide on the sentence of life or death," and

(3) whether defendant was deprived of due process of law during the guilt-innocence phase of his trial because he was not provided the opportunity to meet important evidence used against him to establish some of the special elements required for conviction of aggravated murder.

### 1. *Remand for Resentencing Only.*

The Oregon death penalty statute did not meet federal constitutional muster at the time that the homicide in this case occurred. The Supreme Court of the United States vacated a death sentence and remanded the case to this court in *Wagner v. Oregon, supra,* because of the form of that statute. Thereafter, 100 words were added to the statute in an effort to save it from the constitutional infirmity. The added words were to be effective as of the earlier date that the homicide occurred. The legislature did not add the words; this court's majority did. *See State v. Moen,* 309 Or 45, 102-04, 786 P2d 111 (1990) (Fadeley, J., dissenting) (detailing the 100-word addition to statute). When the people adopted the death penalty statute by the initiative process, they did not include those 100 words. This court had no authority to make a substantial, significant, and after-the-fact addition to the 1984 statute.[1] Only the legislative branch may enact penal laws. *State v. Isom,* 313 Or 391, 395, 837 P2d 491 (1992) ("the power of punishment is legislative").

As stated in the first three paragraphs of my dissenting opinion in *State v. Williams,* 313 Or 19, 44-45, 828 P2d 1006, *cert den* 121 L Ed 2d 118 (1992), I continue to believe the remand should be to impose the mandatory life sentence provided by statute, obviating the need for a new jury and new trial.

---

[1] The applicable Oregon statute is clear. "In the construction of a statute, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted * * *." ORS 174.010. *See, e.g., Rosentool v. Bonanza Oil and Mine Corp.,* 221 Or 520, 527, 352 P2d 138 (1960) (legislature would have placed the words "upon such proof of proper purpose" in the statute had it so intended and this court is precluded from adding the words to the statute).

## 2. *Tell the Jury That It Decides.*

The second issue may come into play on remand because the majority remands to empanel a new jury for a new penalty-phase trial. At the former trial, error occurred concerning the issue of whether the jury decides on the death penalty because the court told the jurors that they did not decide, an inaccuracy reinforced repeatedly by the prosecutor. The record containing the error follows.

During the *voir dire* of a specific venireman who was eventually selected as a juror, the following occurred:

"Q [BY DEFENSE ATTORNEY]: Actually, in this situation, the State is seeking the death penalty, and it is the jury that decides whether the death penalty or life imprisonment should be imposed.

"[PROSECUTOR]: Object, Your Honor. It's a misstatement of the law.

"THE COURT: Yes. I don't think we should characterize it that the jury decides. You may tell him what the procedure is. That's appropriate."

Later in the *voir dire* of this juror the following occurred:

"[PROSECUTOR]: Objection, Your Honor.

"THE COURT: Yes. I'll sustain as to form. *The jury does not decide on the sentence of life or death.* The jury answers three questions. I think in fairness to the jurors, I think it should be made clear to them that they answer three questions." (Emphasis added.)[2]

During closing argument in the penalty phase, the prosecutor made the following statement to the jury:

"Finally, Ladies and Gentlemen, I would like to comment on an argument counsel made yesterday, and that is — he said this repeatedly, I did not object — he said that you folks will decide if Michael Tucker deserves the death penalty. He said the State of Oregon is asking you folks to decide what should happen in this case. *That simply is not true. In the first place, you'll have the verdict form, and you'll find that that question isn't asked anywhere.* The questions asked are the ones we've gone over. [The penalty verdict form contained two

---

[2] Only two questions, related to deliberateness and future dangerousness, were on the verdict forms ultimately supplied to the jury.

questions, whether defendant killed deliberately and whether there was a risk of future dangerousness.]

"You folks know the connection between the questions and the decision, nobody is trying to fool you on that, but more importantly none of you people decided if the defendant deserves the death penalty, none of you people will. * * *

"* * * * *

"Nobody in this case is asking you jurors to go out and find a verdict that the defendant should get the death penalty." (Emphasis added.)

The trial court's refusal to give either defendant's requested instruction 29 or 29A, refusals duly excepted to, left the jury inaccurately informed concerning the meaning and gravity of their answers to the inadequate statutory questions.

The Supreme Court of the United States requires an individualized judgment as to whether the individual defendant deserves the sentence of death, an issue which in Oregon is left up to the penalty-phase jury alone. The trial judge has no sentencing discretion whatever once their verdict is in. The automatic appellate review does not touch the jury's findings if supported by proper evidence.

In *Caldwell v. Mississippi*, 472 US 320, 342-43, 105 S Ct 2633, 86 L Ed 2d 231 (1985), Justice O'Connor, concurring in part and concurring in the judgment, described the Supreme Court's requirement for an individualized judgment as follows:

"In my view, the prosecutor's remarks were impermissible because they were inaccurate and misleading in a manner that diminished the jury's sense of responsibility. I agree there can be no 'valid state penological interest' in imparting inaccurate or misleading information that minimizes the importance of the jury's deliberations in a capital sentencing case.

"* * * * *

"As the Court notes, however, the Mississippi prosecutor's argument accomplished the opposite result. In telling the jurors, 'your decision is not the final decision . . . [y]our job is reviewable,' the prosecutor sought to minimize the sentencing jury's role, by creating the mistaken impression that automatic appellate review of the jury's sentence would provide the authoritative determination of whether death

was appropriate. In fact, under Mississippi law the reviewing court applies a 'presumption of correctness' to the sentencing jury's verdict."

In *Turner v. Murray*, 476 US 28, 33-34, 106 S Ct 1683, 90 L Ed 2d 27 (1986), the lead opinion states:

"In a capital sentencing proceeding before a jury, the jury is called upon to make a 'highly subjective, "unique, individualized judgment regarding the punishment that a particular person deserves" ' *Caldwell v. Mississippi*, 472 US 320, 340, n 7, 86 L Ed 2d 231, 105 S Ct 2633 (1985) (quoting *Zant v. Stephens*, 462 US 862, 900, 77 L Ed 2d 235, 103 S Ct 2733 (1983) (Rehnquist, J., concurring in judgment)).

"* * * [O]ur cases establish that every capital sentencer must be free to weigh relevant mitigating evidence before deciding whether to impose the death penalty, *see, e.g., Eddings v. Oklahoma*, 455 US 104, 71 L Ed 2d 1, 102 S Ct 869 (1982); *Lockett v. Ohio*, 438 US 586, 597-609, 57 L Ed 2d 973, 98 S Ct 2954, 9 Ohio Ops 3d 26 (1978) (plurality opinion), and that in the end it is the jury that must make the difficult, individualized judgment as to whether the defendant deserves the sentence of death."

Moreover, as *Witherspoon v. Illinois*, 391 US 510, 522, 88 S Ct 1770, 20 L Ed 2d 776 (1968), and *Morgan v. Illinois*, ___ US ___, 112 S Ct 2222, 119 L Ed 2d 492, 506 (1992), make clear, a prospective juror who *automatically* will vote *either* for the death penalty or against it is not qualified to serve. This juror disability is premised on the legal fact that the jury determines whether death or life shall be the sentence imposed individually and the disability is to be discovered by questioning prospective jurors about the dogmatics of their individual attitudes toward the death penalty. In brief, a juror must be "indifferent as he stands unsworn." 3 Coke on Littleton 500 (J.H. Thomas ed 1826).

The majority attempts to avoid the foregoing constitutional defect in defendant's trial by answering it with two arguments, one substantive and the other technical or procedural.

The substantive argument is that a different, but accurate, instruction about who bears the responsibility for imposing the death penalty was given, one that "accurately conveyed to the jury its role in determining defendant's

sentence" and one that "adequately covers the subject of the requested instruction." 315 Or at 332.

However, the instruction given does not tell the jury that they have the responsibility for deciding, it says that the "law" decides. Nor, does the instruction given have any place where the jury may consider mitigating circumstances or otherwise decide that the death penalty is not appropriate in the individual case even though deliberateness and risk of future dangerousness are found to be present. Indeed, the instruction that the majority would approve is indistinguishable from the statutory situation found constitutionally wanting in *Wagner v. Oregon, supra*, leading to vacation of sentence here. We need not go that route again. *See State v. Wagner*, 305 Or 115, 219, 752 P2d 1136 (1988) (Gillette, J., dissenting, joined by Linde, J.) (predicting that Oregon's three-question death penalty scheme would be found constitutionally infirm).

The technical point is stated by the majority as a conclusion that the claim of error was not preserved. First, defendant requested instructions and excepted to the refusal to give them. Second, defendant asked the question of the juror on *voir dire* and it was the opponent's objection that was sustained in error. Defendant need not do anything further to preserve that error, having already indicated to the court that defendant believes the law requires letting the jury know that they decide on the death penalty sentence and having maintained that legal position throughout the trial by requesting instructions to that effect and excepting to denial of those instructions.

### 3. *Due Process Requires Opportunity to Meet Adverse Evidence.*

Defendant contends that a new trial of the guilt-innocence phase is required. Because I conclude that defendant was denied due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution, I would broaden the majority's remand for selecting a new jury and conducting a new penalty-phase trial to require that the new trial include the guilt-innocence phase as well. *State v. Brown*, 310 Or 347, 374, 800 P2d 259 (1990) (remanding for sentencing for violation of ORS 163.115, intentional

non-capital murder, or for retrial under ORS 163.095, aggravated capital murder, where there was reversible error related only to the aggravating element making the homicide a capital crime).

Because (1) the jury will be selected anew, and (2) because the evidence required to be offered by the state in the penalty phase to support the death penalty will be mostly the same evidence as would be used to establish guilt or innocence related to homicides in the course of robbery or burglary, the entire case may be retried with little if any added cost or delay as compared to a trial of penalty phase only. If the prosecutor decides to retry the case on remand rather than to seek life imprisonment under the felony murder statute, the guilt or innocence phase of the case must be retried in my view because of the due process violation in the former trial of that phase. I turn to a description of that violation and an evaluation of how it contributed to the guilty verdicts.

The facts leading to the homicides in this case are these. Defendant and another miscreant discussed places that they might burglarize and rob. The other suggested the home of the two victims in this case. The other's wife had worked there and the other knew of ways to enter and steal. After the victims were shot in the course of the ensuing burglary, only defendant was charged with aggravated murder.

Evidence to prove that the murders were intentionally and personally committed by defendant (as is required to make them aggravated murder, as to defendant) — thus making defendant eligible for a death sentence — consisted of only the following: testimony of the other miscreant; admissions defendant made to his former girl friend who, initially at least, shared in receiving some of the stolen property; and testimony of jailhouse inmates who shared cellspace with defendant after his arrest. Defendant's assignment of error involves the testimony of the last kind of witness.

The claim of error requires that we first establish the context for the relevant aggravated murder statute. Oregon, by a separate statute providing for a maximum punishment of life in prison, also recognizes the felony murder doctrine

that causing death during the course of certain felonies is murder equivalent to intentional murder. Oregonians authorized the death penalty for only a few intentional or felony homicides where one or more additional aggravating elements are present.

The people of Oregon require that, for a felony related murder to become a capital or aggravated murder, the involvement of the death-eligible defendant must be more culpable than simple participation in committing the felonies on which the aggravation is partially based.

ORS 163.095(2)(d) in part provides that for a felony murder to become aggravated murder, the jury must find that: "the defendant personally and intentionally committed the homicide under the circumstances set forth in ORS 163.115(1)(b) [during the commission of certain felonies.]" A felony participant who does not both intend to kill and personally commit the homicide cannot be found guilty of aggravated murder or be sentenced to death. Proof of the aggravating element is required in the guilt or innocence phase of the trial.

The Supreme Court does not now require intent to kill and personal commission of the homicide in order to uphold a state law assessing capital punishment for felony murder, *compare Enmund v. Florida*, 458 US 782, 102 S Ct 3368, 73 L Ed 2d 1140 (1982) (death penalty may not constitutionally be imposed on a defendant who aided and abetted a felony, but who did not kill, attempt to kill or intend that a killing take place), *with Tison v. Arizona*, 481 US 137, 149-52, 107 S Ct 1676, 95 L Ed 2d 127 (1987) (defendant may be sentenced to death although he did not intend to kill, if he was a major participant in the felony and showed reckless indifference to human life). Oregon has done so, with legal results as in *Enmund*, but based on state law. With that statutory context in mind, I turn to the testimony giving rise to the claim of error.

During the trial, one of the jail-house witnesses indicated in an answer that defendant "was proud" of killing the victims. The questions asked and answers given are as follows:

"Q. [BY THE PROSECUTOR] Okay. In his conversations with the group that you heard, did Mr. Tucker ever indicate

whether this was some sort of an accident that they were shot?

"A. No.

"Q. What did he — What did he say to you in that regard?

"A. He told me he shot them both point blank. And he seemed real proud of the fact that he did that."

The judge, on defendant's objection and motion, ruled:

"THE COURT: Sustained. That characterization will be stricken from the record. I instruct the jury to disregard that last remark."

Notwithstanding this ruling, at the close of the guilt-innocence phase of the trial, the prosecutor argued that defendant was "bragging" of having killed the victims. The argument, defendant's timely objection to it, and the court's ruling thereon are as follows:

"[THE PROSECUTOR]: After his arrest, Michael Tucker was lodged in the Polk County Jail. While he was there, he told fellow inmates about the murders, not so much talking about them as bragging about them * * *.

"[DEFENSE ATTORNEY]: Excuse me, Your Honor. But I do have an objection. That testimony was specifically ordered stricken from the record, about the bragging.

"THE COURT: The jury will have to rely on their own recollection. I don't know that it was stricken. I just can't remember. You may proceed."

The trial court, apparently forgetting its ruling some weeks earlier, did not require the prosecutor to refrain from arguing that the evidence that the jury had heard but which was stricken from the record justified a conviction for the aggravated murder charge. The trial court left it to the jury to decide whether to consider the stricken evidence.

That exchange, with its judge's response that he was not sure whether the specific evidence was in the case and that the jury would have to rely on its own recollection, left the situation unacceptably ambiguous. One or more of the jurors may very likely have thought that the judge was giving them permission to use any testimony of which they had a recollection. Because capital verdicts must be unanimous, the realistic potential that even one of the jurors believed that the "proud-of-it" evidence could be used to convict would require

reversal. They all could recall what they heard in the courtroom, that defendant was "proud" that he had killed.

When the trial judge ruled that the evidence was not admissible, that ended defendant's consideration of it and should have ended a juror's consideration also. It also ended any opportunity[3] to meet that evidence by any means, including cross-examination, or any other controversion. When defendant made his decision not to testify, he was entitled to rely on the court's ruling withdrawing the "proud-of-it" testimony from the jury. No other direct "proud" evidence, or evidence to support a claim of bragging, strictly within the dictionary definition of that term, is in the record. Certainly there was no opportunity to cross-examine the "proud" statement. Because the evidence was nonetheless used against him and because defendant had no opportunity to meet that evidence, defendant was denied his right to a trial that accords him the due process required by the Fourteenth Amendment to the United States Constitution.[4]

Neither this court nor the United States Supreme Court has directly held that a lack of opportunity to meet evidence used against a criminal defendant does or does not result in denial of due process to that defendant. However, in several cases, related rulings have been made that support the conclusion that federal due process requires such an opportunity and that, absent that opportunity, a conviction is constitutionally defective and reversible. The error that defendant complains of, therefore, requires consideration under federal law of the constitutional validity of the guilt-

---

[3] There is no quarrel with my Brother Unis about his method of approach or whether the initial ruling of the trial court striking the "proud-of-it" statement was appropriate. But the evidence was later used against defendant, with the judge's apparent acquiescence as the jury would understand, even though the result of the trial court's ruling was to dispense with any opportunity of defendant to effectively cross-examine or otherwise meet the evidence used against him. Surely the fact that evidence could have been admitted does not justify basing a verdict on that evidence after it was in fact excluded.

[4] Defendant's argument regarding the admission of the stricken evidence raises the issue whether he was deprived of a fair trial because he could not confront all the evidence used against him. He clearly preserved the claim of error under the rule of *State v. Hitz*, 307 Or 183, 766 P2d 373 (1988). As occurred in *State v. Farber*, 295 Or 199, 666 P2d 821 (1983), however, the parties have not briefed this question under the Oregon Constitution or suggested why a different result would be required by that document. According, I only address the error under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

innocence phase of his trial and of the verdicts of conviction rendered on charges that required, for conviction, both personal intent to kill and personally carrying out that intent.

Abstractly discussing the parameters of due process, this court has said in *State v. Turner*, 253 Or 235, 238, 453 P2d 910 (1969), that "[w]hen liberty is at issue, due process of law must be satisfied." *See also State v. Gann*, 254 Or 549, 561-62, 463 P2d 570 (1969) (due process requires the use of procedures that are so fundamental that their absence impairs or discredits the criminal proceeding); *McWilliams v. Gladden*, 242 Or 333, 344, 407 P2d 833 (1965) (purpose behind constitutional requirement of due process is to prevent a conviction by methods that are inconsistent with the American view of fair play). *See also Duncan v. Louisiana*, 391 US 145, 148-49, 158, 88 S Ct 1444, 20 L Ed 2d 491 (1968) (stating that whether the right denied is "essential for preventing miscarriages of justice" is a test for whether the right is guaranteed by Fourteenth Amendment).

The Supreme Court of the United States has said in *Skipper v. South Carolina*, 476 US 1, 5 n 1, 106 S Ct 1669, 90 L Ed 2d 1 (1986):

"[I]t is not only the rule of *Lockett [v. Ohio*, 438 US 586, 57 L Ed 2d 973, 98 S Ct 2954, 9 Ohio Ops 3d 26 (1978),] and *Eddings [v. Oklahoma*, 455 US 104, 71 L Ed 2d 1, 102 S Ct 869 (1982),] that requires that the defendant be afforded an opportunity to introduce evidence on this point; it is also the elemental due process requirement that a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain.' *Gardner v. Florida*, 430 US 349, 362, 51 L Ed 2d 393, 97 S Ct 1197 (1977)."

Defendant here had "no opportunity to deny or explain" evidence stricken from the record.

In *Chambers v. Mississippi*, 410 US 284, 302-03, 93 S Ct 1038, 35 L Ed 2d 297 (1973), a case where state law excluded evidence favorable to a defendant and which would permit the defendant to meet other evidence admitted against him, the Supreme Court said:

"Few rights are more fundamental than that of an accused to present witnesses in his own defense. *E.g., Webb v. Texas*, 409 US 95, 34 L Ed 2d 330, 93 S Ct 351 (1972); *Washington v. Texas*, 388 US 14, 19, 18 L Ed 2d 1019, 87 S Ct

1920 (1967); *In re Oliver*, 333 US 257, 92 L Ed 682, 68 S Ct 499 (1948). * * * That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

"We conclude that the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process. In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial."

Here, defendant could not cross-examine that which was stricken; nor could he appropriately create any other opportunity to meet what was not in the case.

In *Re Green*, 369 US 689, 691-92, 82 S Ct 1114, 8 L Ed 2d 198, 201 (1962), the Supreme Court said:

"We said in *Re Oliver*, 333 US 257, 275, 92 L ed 682, 695, 68 S Ct 499, that procedural due process 'requires that one charged with contempt of court * * * have a reasonable opportunity to meet [the charge]* * * by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation.' "

The concurring opinion in *Re Green, supra*, also said:

"Nevertheless, I agree that for a different reason petitioner's conviction did not comport with the requirements of due process. * * * [P]etitioner was denied the right to present this testimony." 369 US at 696-97.

Inability to present evidence to meet the evidence against the defendant in *Green* violated due process.

In *Turner v. Louisiana*, 379 US 466, 472-73, 85 S Ct 546, 13 L Ed 2d 424 (1965), the Supreme Court of the United States said:

> "The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury. * * *

> "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel."

Use by a jury of evidence not developed at trial violates due process.

In my estimation, a due process violation is clearly present where, as here, the jury is permitted to use evidence to convict that defendant did not have an opportunity to meet. If no opportunity were provided to meet any of the evidence, a structural defect would exist that is not subject to harmless error analysis under the discussion in *Arizona v. Fulminante*, 499 US ___, 111 S Ct 1246, 113 L Ed 2d 302, 331 (1991). *See White v. Maryland*, 373 US 59, 83 S Ct 1050, 10 L Ed 2d 193 (1963) (harmless error analysis not applicable to permanent loss of defenses because of lost opportunity to assert them by reason of absence of counsel at arraignment).

Nonetheless, the fact of a constitutional violation does not automatically require reversal and remand. Many federal constitutional errors, for example those arising from evidentiary rulings, may be subject to federal harmless error analysis.

The Supreme Court of the United States held in *Chapman v. California*, 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705 (1967), that, for an error involving denial of a federal constitutional right in a state criminal case to be held harmless, the reviewing court "must be able to declare a belief that it was harmless beyond a reasonable doubt" and that the error did not "contribute" to the defendant's conviction. Error was found, and the conviction was reversed in that case.

Does the general instruction in this case — to limit the jury's consideration to the evidence received — make the error harmless? There is no case directly on point with the present case, but several federal cases point to the answer

that an instruction does not *ipso facto* erase prejudice or relegate the constitutional error to a harmless status. Where the error arises from not being able to confront and meet an adverse witness's testimony, apparently the prejudice of that constitutional error is judged in relation to the effect of the deprivation on that one witness's testimony, not on the overall outcome of the trial as a whole.[5]

In *Delaware v. Van Arsdall*, 475 US 673, 679-80, 106 S Ct 1431, 89 L Ed 2d 674 (1986), the Supreme Court lays out that principle as follows:

> "In this case, however, the trial court prohibited all inquiry into the possibility that Fleetwood would be biased as a result of the State's dismissal of his pending public drunkenness charge. By thus cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated respondent's rights secured by the Confrontation Clause.

> "The State somewhat tentatively suggests that a defendant should have to show 'outcome determinative' prejudice in order to state a violation of the Confrontation Clause: Unless the particular limitation on cross-examination created a reasonable possibility that the jury returned an inaccurate guilty verdict, that limitation would not violate the Confrontation Clause. We disagree. While some constitutional claims by their nature require a showing of prejudice with respect to the trial as a whole, see, e.g., *Strickland v. Washington*, 466 US 668, 80 L Ed 2d 674, 104 S Ct 2052 (1984) (ineffective assistance of counsel), the focus of the Confrontation Clause is on individual witnesses. *Accordingly, the focus of the prejudice inquiry in determining whether the confrontation right has been violated must be on the particular witness, not on the outcome of the entire trial.* It would be a contradiction in terms to conclude that a

---

[5] Thus, the majority's claim of some other evidence from other witnesses, from which an inference of "bragging" could be drawn, even if it were accurate, could not prevent the fact of prejudicial error in this case. In *Satterwhite v. Texas*, 486 US 249, 108 S Ct 1972, 100 L Ed 2d 284 (1988), the Supreme Court held that error in admitting evidence of a psychiatrist's testimony in violation of Sixth Amendment rights in a capital case was not harmless even though there was other evidence to the same effect. The Court reversed a sentence of death, noting that the state had relied heavily on that constitutionally improper evidence and that the other similar evidence was not of similar impact.

defendant denied any opportunity to cross-examine the witnesses against him nonetheless had been afforded his right to 'confront[ation]' because use of that right would not have affected the jury's verdict. We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' *Davis v. Alaska*, [415 US 308, 318, 39 L Ed 2d 347, 94 S Ct 1105 (1974)]. Respondent has met that burden here. A reasonable jury might have received a significantly different impression of Fleetwood's credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination." (Emphasis added; footnote omitted.)

*White v. Illinois*, 502 US ___, 112 S Ct 736, 116 L Ed 2d 848 (1992), refers to the loss of cross-examination as the loss of: " 'the greatest legal engine ever invented for the discovery of truth.' [*California v.] Green*, 399 US [149,] 158, 26 L Ed 2d 489, 90 S Ct 1930 [1970]." That loss, as well as others, is present where, as here, the jury is permitted to use evidence to convict that defendant had no opportunity to meet because it was excluded from the case before defendant's opportunity arose.

Again, while not totally dispositive about the effect of an in-trial instruction to disregard on the harmful nature of a constitutional error, the federal cases most applicable to the present case do point in a definite direction — away from a holding of harmlessness. *See Morgan v. Illinois, supra*, 119 L Ed 2d at 508 (neither "follow the law" questions put to jurors and answered in the affirmative, nor the juror's oath are sufficient to override due process violation — not even where the court also gave instructions to disregard the subject of the violation); *United States v. Carroll*, 678 F2d 1208, 1210 (4th Cir 1982) ("curative" instructions given after prosecutor improperly argued evidence not in the record did not make error harmless). In the present case, after the in-trial instruction, the prosecutor brought the unmet evidence before the jury again, with apparent permission of the trial court.

In *Berger v. United States of America*, 295 US 78, 85-88, 55 S Ct 629, 79 L Ed 1314 (1934), the Supreme Court stated:

"The trial judge, it is true, sustained objections to some of the questions, insinuations and misstatements, and instructed the jury to disregard them * * *. It is impossible to say that the evil influence upon the jury of these acts of misconduct was removed by such mild judicial action as was taken.

"The prosecuting attorney's argument to the jury was undignified and intemperate, containing improper insinuations and assertions calculated to mislead the jury. A reading of the entire argument is necessary to an appreciation of these objectionable features. The following is an illustration: A witness by the name of Goldie Goldstein had been called by the prosecution to identify the petitioner. She apparently had difficulty in doing so. The prosecuting attorney, in the course of his argument, said:

> " 'Mrs. Goldie Goldstein takes the stand. She says he knows Jones, *and you can bet your bottom dollar she knew Berger*. She stood right where I am now and looked at him and was afraid to go over there, and when I waved my arm everybody started to holler, "Don't point at him." You know the rules of law. Well, it is the most complicated game in the world. I was examining *a woman that I knew knew Berger and could identify him*, she was standing right here looking at him, and I couldn't say, "isn't that the man?" Now, imagine that! But that is the rules of the game, and I have to play within those rules.'

"The jury was thus invited to conclude that the witness Goldstein knew Berger well but pretended otherwise; and that this was within the personal knowledge of the prosecuting attorney.

"* * * * *

"In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its non-existence. If the case against Berger had been strong, or, as some courts have said, the evidence of his guilt 'overwhelming,' a different conclusion might be reached. * * * (citing cases.)" (Emphasis in original.)

*See also State v. Blodgett*, 50 Or 329, 342, 92 P 820 (1907) ("it will not do for the court to remain silent, leaving the matter of misconduct with the offending party and the jury").

The effect as to the witness who testified that defendant was "proud-of-it" was prejudicial. In this case, defendant could not even attempt to meet that prejudice. I cannot

say that I believe beyond a reasonable doubt that the prejudice did not contribute to conviction. I dissent and would remand for resentencing to life imprisonment for felony murder, or for retrial of guilt or innocence.